PAULE, Appellant, vs. THE FLORENCE MINING COMPANY, Respondent.

*October 2 — October 20, 1891.*

*Master and servant: Assumption of risk of employment.*

The plaintiff, a "trammer" in a mine, was directed by the captain to help the miners "fix the roof — take down some ground" in a stope. While doing so he was injured by ore or rock falling from a place in the roof which had just been tested in his presence and which had seemed to be so solid that it could not be pulled down without blasting. He had been tramming for four months in this and other stopes in which the miners were in the habit of blasting down ore. *Held*, that he must have known the dangers of this temporary employment, and, having undertaken it without objection, he assumed the risk. *Gill v. Homrighausen*, 79 Wis. 634, distinguished.

APPEAL from the Circuit Court for *Florence* County. Action to recover damages for personal injuries. The

complaint alleges, in effect, that the plaintiff, being with-
out knowledge as a miner, entered the employment of
the defendant as a common laborer, and engaged, in con-
nection with others, in tramming or filling cars with ore in
a pit or stope known as "No. 4 Stope," reached by "Num-
ber 4 Shaft," in the mine of the defendant; that the plaint-
iff had no duty or care with reference to the walls or roof
of any part of said mine; that all work done in said stope,
whether by the plaintiff or others, was entirely under the
direction and control of the defendant, through its captain
or shift boss; that the duty of keeping said mine and the
roof of any stope therein free from any loose and danger-
ous rock was solely incumbent upon the defendant; that
upon the night of January 5, 1887, a portion of the roof or
back of said stope became unsafe, and liable at any time to
fall, which fact was known to the defendant, but unknown
to the plaintiff, who at the time had no knowledge what-
ever of mining; that he was then engaged in the only ac-
cupation for which he had been employed by the defendant,
to wit, that of tramming ore; that on said night the defend-
ant, knowing of such danger, through its under-ground cap-
tain, John Buddle, negligently and without warning the
plaintiff thereof, wrongfully directed him to assist some
miners, who knew of the danger and were about to remove
said dangerous ground, in the erection of a scaffold, by
means of which the same could be reached; and while so
employed under the direction of said Buddle in and around
said scaffold, and without any fault or negligence on his
part, a mass of dirt, rock, or ore fell from said roof or back
upon the plaintiff, crushing him, breaking his right thigh
and right ankle and his left leg, and resulting in the suffer-
ing and injury complained of.

The answer consists of admissions, denials, and allega-
tions, among others, to the effect that the plaintiff entered
such employment of the defendant, and assumed the risks

thereof; that the plaintiff was fully aware of the danger of taking down such masses of dirt, rock, and ore; that before said accident the plaintiff had frequently applied to the defendant for work as a miner, and represented himself as such, and upon the faith of such representations he was set at the work in question; and that the injury was without the negligence or fault of the defendant, and was caused by the contributory negligence of the plaintiff.

At the close of the testimony the defendant moved the court to direct a verdict in its favor, which motion was granted, and a verdict was directed in favor of the defendant accordingly. From the judgment entered upon that verdict the plaintiff appeals.

For the appellant there were briefs by *Eastman & Mountain* and *Arch. B. Eldredge*, of counsel, and oral argument by *Mr. Eldredge* and *Mr. C. E. Eastman.*

For the respondent there was a brief by *Fairchild & Fairchild*, and oral argument by *Mr. H. O. Fairchild.*

CASSODAY, J. The testimony is voluminous. Only a brief outline of it can be here given, and that will be confined almost wholly to the testimony of the plaintiff. From his testimony it appears, in effect, that he came to America in 1880 or 1881; that he went to Iron Mountain, Mich., in the spring of 1885; that prior to that his business was farming; that he worked in a stone quarry at Iron Mountain, taking out stone; that he thought his wages too small, and so went and worked shoveling ore on the cars on the surface of a mine at so much a ton; that he remained there about a month, when they raised his wages at the stone quarry, and then he went back and worked in the quarry; that he had trammed ore out west in a gold mine, under ground, but that it was not dangerous; that afterwards he went and shoveled ore under ground in the Chapin mine for about a month; that he then quit and went to Flor-

ence, and tended bar for about two weeks; that he then applied to the defendant for a job, and was employed by it, and set to pumping; that he soon got sick and had to quit; that when he got well he again applied to the defendant for work; that the superintendent asked him if he would like to go down and tram ore, and that he answered in the affirmative; that he went down and began tramming ore the last of August or the first of September, 1886; that he continued that work — tramming ore — until he was injured, January 5, 1887; that his duties in the mine were shoveling ore into the cars, then tramming it to the skip, and dumping it in the skip; that he and one Andrew Pauls were partners, and as such ran one car in such tramming at twenty cents per ton; that his work did not require him to do any other duties; that he had nothing to do with breaking ore,— did not mine in any way; that he had no duty with reference to keeping the walls safe; that it was the captain's business to keep the walls and ground safe; that the miners did it in the mine.

It appears from other undisputed evidence that the place where the ore was thus dumped off was at or near the open end of the shaft which led into the mine; that the ore was brought out of the mine in small cars, propelled by two men to each car; that as you entered that shaft and went back into the mine, and nearly 100 feet from its mouth, there was a stope on the left running back in a lateral direction about sixty feet, from which ore had been taken, known as "Stope No. 3;" that as you continued in a direct line from the entrance of the shaft,— a distance of about 200 feet from the mouth,— you came to a turn-table, from which such cars ran on tracks into each of the three stopes having their respective openings at or near that point; that the stope nearly in a direct line with the shaft mentioned extended beyond the turn-table about 100 feet, and also in lateral directions, and was known as "Stope No. 1;" that

as you pass into the shaft to the turn-table there is a stope running back to the left about 150 feet, known as "Stope No. 2," and to the right another stope running back 150 feet or more, known as "Stope No. 4," and this is the one in which the accident occurred. The plaintiff testified, in effect, that at the time of the accident it ran back from its mouth or narrower portion about 100 feet, and that it was from eighteen to twenty feet high and from twenty-five to thirty feet wide; that there were two trammers to each car on the night shift, and also on the day shift; that each set would change off every week from day shift to night shift; that when he quit work on the night shift of January 4, 1887, he knew nothing of any ground being loose or dangerous in stope No. 4; that he and his partner and the other trammers entered upon this night shift, as usual, about 7 o'clock on the evening of January 5, 1887; that he and his partner ran their car nearly to the back end of stope No. 4, and filled it, and then trammed that car out and dumped it in the skip; that they then went back into the same place and filled another car, and ran it out onto the turn-table, and there waited for other trammers to pass; that, while there waiting, the night captain or boss, Buddle, came to where he was, and stated that one of the miners was absent, and said, "*Louis*, you go in and help the miners in No. 4 pit," and he, the plaintiff, answered, "All right;" that Buddle then told him "to go in and help the miners; they were going to fix the roof in No. 4 pit,— take down some ground," and to do what they told him; that he then went in and helped the miners put up a scaffold; that it stood at or near the car track, and some twenty feet or more back in the stope; that Buddle came in and directed them to take down the scaffold and put it up in another place where he directed — some eight or ten feet from where the first was located; that they did so, and that it was constructed of three or four ladders and planks across;

that when completed he told Buddle the scaffold was fin-
ished; that thereupon Buddle went up onto the scaffold and
looked where to put the hole; that he then asked for a
pick; that he, the plaintiff, had been using it, and that it
was then lying on the ground under the scaffold at the
end; that he went for the pick, and bent down to get it;
that, as he started to raise up, the ore fell down upon him
and injured him; that the accident occurred between 9 and
10 o'clock in the evening; that he never saw scaffolding put
in a mine before, and did not, during the time mentioned,
know they were taking down ground that was loose or
liable to fall; that he knew the miners broke the ore down
from the roof, back, and sides of the mine while they were
tramming the ore; that he supposed Buddle went upon the
scaffold to sound the ground to find the best place to put
powder in to blast it down; that he never saw that done in
the roof before, but had in the breast close up to the roof;
that when they blasted close up to the roof the ore fell
down; that when Buddle went upon the scaffold he thought
he was going to pull that ground down; that he did not
recollect whether Buddle went up on the first scaffold or
not; that he did go onto the second scaffold, and took a
pick and tried to pull down some ground and ore.

It is very manifest from the other witnesses that Buddle
did go upon the first scaffold, and sounded the wall above,
and tried to pull down the ore with a pick, but that it was
too firm to do so; that, upon the second scaffold being
built, he went upon that, and, after sounding the wall
above, he called for the pick, and while the plaintiff was in
the act of getting it from the ground at or near where the
first scaffold stood the ore or rock fell of itself upon the
plaintiff.

Such is a fair outline of the facts and circumstances under
which the plaintiff was injured. There can be no question
but that when the plaintiff entered upon his work as a

trammer, four months prior to the injury, he assumed the ordinary risks of his employment. *Naylor v. C. & N. W. R. Co.* 53 Wis. 661; *Hobbs v. Stauer*, 62 Wis. 110; *Stephenson v. Duncan*, 73 Wis. 404; *Sweet v. Ohio Coal Co.* 78 Wis. 130. But it is strenuously contended by the learned counsel for the plaintiff that there is evidence on his part tending to prove that Buddle requested him to perform the duties of an absent miner on the evening in question without informing him of the impending danger from the overhanging dirt, ore, and rock, and that the plaintiff entered upon such new duties without being aware of such danger, and hence that the case should have been submitted to the jury. This court has held that when an employee of mature years and of ordinary intelligence and experience is directed by his employer to do a temporary work outside of the business he has engaged to do, and consents to do such work, without objection on account of his want of knowledge, skill, or experience in doing such work, no negligence can be predicated upon such state of facts alone. *Cole v. C. & N. W. R. Co.* 71 Wis. 114, and the authorities there cited. This rule may not be applicable where such temporary work is entirely different in kind, and the perils of which are such that the servant could acquire no knowledge of them in the business for which he was engaged, or where the servant, against his objection, is forced to perform such temporary work. Here it appears from the undisputed evidence that the miners were in the habit of blasting down ore in the several stopes mentioned three or four times a week during the whole four months the plaintiff had been working there; that the plaintiff trammed ore from the same stopes in which the blasting took place. The plaintiff admits that he had frequently known of the miners blasting from the breast and sides, and that he made no objection to the performance of such temporary work when requested. The very nature of his employment, the neces-

Paule vs. The Florence Mining Co.

sary conditions which surrounded him while so engaged, and the experience he concedes to have had, forces the conviction that at the time of the accident he must have known that loosened, overhanging dirt, ore, and rock were liable to fall, and of course liable to injure any one who happened to be under them when they did fall. Besides, it conclusively appears, in effect, that the first scaffold was not only erected by the miners under, or nearly under, the place from which the ore or rock finally fell, but that they went upon it, and tested the ore and rock above, and finally concluded that the same could not be pulled down even with a pick, without further blasting; and so the scaffold was moved to another place for the very purpose of putting in a blast, and thus forcing the parts down. The miners testified, in effect, that they did not apprehend danger from the appearances and such test, and their conduct demonstrates that they did not, otherwise they would not have thus voluntarily exposed themselves to what the subsequent occurrence proved to be a real peril. In this the case is clearly distinguishable from *Gill v. Homrighausen,* 79 Wis. 634. In that case there was evidence tending to show that the danger was apparent to experts, but not to the plaintiff, who was a non-expert.

*By the Court.*— The judgment of the circuit court is affirmed.