REED v. STOCKMEYER.

(Circuit Court of Appeals, Seventh Circuit.    May 4, 1896.)

No. 160.

1. MASTER AND SERVANT—LIABILITY OF MASTER—WORK OUTSIDE THE SCOPE OF EMPLOYMENT.

The liability of a master, in cases of injury to his servant, received in a dangerous employment outside of that for which he had engaged, arises not from the direction of the master to the servant to depart from the one service and engage in the other and more dangerous work, but from failure to give proper warning of the attendant danger, in cases where the danger is not obvious, or where the servant is of immature years, or unable to comprehend the danger.

2. SAME.

Plaintiff was employed in defendant's quarry as a scabbler, or preparer of the stone for hewing. He had been employed in this and other neighboring quarries for more than two years, was acquainted with the operations of channeling stone and turning over cuts of stone after channeling, and knew of the existence in the rock of seams which rendered the cuts of stone liable to break in the operation of channeling and cutting out. The foreman of the quarry, who, for the purpose, represented defendant, directed plaintiff to leave his work of scabbling, which was without risk, and assist in breaking out a cut of stone by the use of wedges. After trying without success to break out the stone, the foreman directed him to go down to a position below the cut of stone, and clear the way for the use of a steam drill. While plaintiff was thus engaged, the foreman continued to use the wedges to break out the stone, and during this operation a piece of the stone, by reason of a seam therein, split off, and fell upon and injured plaintiff. The existence of the seam was concealed by stone dust and mud and was as easily ascertainable by plaintiff as by the foreman. *Held*, that there was no

breach by defendant of any positive duty owing to plaintiff, which produced or contributed to his injury; and the negligent act, if any, causing it, having been that of the foreman, in using the wedges while plaintiff was under the stone, and he having been in this merely a fellow servant of plaintiff, not acting in any matter of control, defendant was not liable.

3. SAME—ASSUMPTION OF RISK.

If a servant, of full age and ordinary intelligence, upon being required by his employer to perform duties more dangerous or complicated than those embraced in his original hiring, undertakes the same, knowing their dangerous character, although unwilling, from fear of losing his employment, and is injured by reason of his ignorance and inexperience, he cannot maintain an action therefor against his employer.

In Error to the Circuit Court of the United States for the District of Indiana.

This suit was commenced by Ludwig Stockmeyer, the defendant in error, to recover damages for personal injuries incurred while in the service of David Reed, the plaintiff in error. The suit was brought in the circuit court of the county of Lawrence, state of Indiana, and duly removed into the court below upon the ground of diverse citizenship of the parties. The complaint originally filed charged that one Drehoble was at the time of the accident, May 6, 1892, in charge of the quarry operated by the plaintiff in error, as superintendent and foreman in the absence of one Robert Reed, the general superintendent; that Stockmeyer, the plaintiff below, was engaged as scabbler in the quarries,—that is, one who prepares stone for the operation of hewing by knocking off the prominences on the surface; that Drehoble attempted to turn and cause to be turned a certain block of stone in the quarry; that the customary and only safe way of quarrying is to drill the stone at the base of the cut on the outside before undertaking to turn the blocks over, and that, in violation of his duty in this respect, Drehoble, the superintendent and foreman, negligently and carelessly undertook to turn and throw over the stone without so drilling, and it was then discovered by Drehoble that there were one or more dry seams running through the stone, thereby rendering the same liable to break and come apart when moved or handled; that, notwithstanding the fact that Drehoble had full knowledge of the dangerous and unsafe condition of the stone, he directed and ordered Stockmeyer, who was then scabbling at another part of the quarry, to work at and immediately below the outside base of the rock so sought to be turned, and to clean away dirt and rubbish from the same, so that the stone might be turned or thrown over; that Stockmeyer, under orders from Drehoble, and without knowledge of the dangerous and unsafe condition of the stone, proceeded to work at the base of the rock, and while so doing under Drehoble's orders, and without fault, Drehoble carelessly and negligently pounding and prying on the rock above Stockmeyer, and as the result of such careless and negligent acts upon the part of Drehoble, the stone parted and broke, slipped and fell upon the plaintiff, occasioning the injuries of which he complained. To this complaint a demurrer was interposed, which, upon argument, was sustained by the court below. Stockmeyer v. Reed, 55 Fed. 259. Afterwards an amended complaint was filed, charging that prior to the accident Stockmeyer was employed and engaged as a scabbler in the quarry and the stone yard of the defendant; that Drehoble, the superintendent, at another place in the quarry was undertaking to turn down a certain block of stone that had been channeled preparatory thereto, except that the cut of stone had not been drilled at the base as was customary, and as was the only safe way to do, but was putting in wedges in the channeled seams, and driving them down with hammers and by steel pries, the men working on the top of the cut; that the cut of stone at the time was full of dry seams, as was well known to Reed, the owner, and to Drehoble; that Stockmeyer was ordered by Drehoble, the superintendent, to leave his place of work, which was a safe and secure place, and directed to go to the base of the cut of stone, which was in a hole, and far from the top of the cut of stone, and at a place where he

could not see the top where other servants of the defendant were at work, and at a very dangerous, hazardous, and unsafe place to work; that Stockmeyer did not know and could not have known of the dry seams and shattered condition of the cut of stone, because they were hidden, and entirely concealed from view by reason of dirt, mud, and other small particles of rock, and by reason of the rock dust that had accumulated on the top and sides of the cut; that while he was at work in this unsafe and dangerous place, not being able to hear what was going on above him, Drehoble directed the men at the top of the cut of stone to hammer and drive wedges in the channeled space, thereby attempting to break loose and turn the cut of stone down, and negligently and carelessly attempted to turn out the cut of stone while the plaintiff was in this hole without knowledge of what was transpiring above him; and that while so doing the cut of stone split, divided and fell down and upon the plaintiff, causing the injuries complained of. A demurrer to this amended complaint was overruled by the court below upon the grounds: First, that Drehoble was charged to be the superintendent of the defendant, and to have complete control of the quarry, and the operation of the same and the servants engaged; and, second, that the wrongful act occasioning the injuries was alleged to have been caused by the negligence of the defendant; the court, in its opinion, observing: "It is alleged that in obedience to the command of his superior, who had the authority over him for that purpose, he was taken from a place of safety and sent into a place of danger. It is further alleged that the plaintiff did not know, and had no means of ascertaining, the danger of the place into which he was sent, and that the defendant and his foreman knew of its dangers, and failed to give warning of them." Upon the trial of the cause the case was rested at the conclusion of the evidence of the plaintiff, and no evidence was proffered by the defendant. Thereupon the defendant asked the court to instruct the jury to return a verdict for the defendant, which request was refused, and the defendant excepted. There was a verdict and judgment thereon for the plaintiff, to reverse which this writ of error is prosecuted. The facts, so far as they are necessary to be considered, are stated in the opinion of the court.

Wm. G. Challis and Moses P. Dunn, for plaintiff in error.

J. S. Duncan, C. W. Smith, and E. R. Keith, for defendant in error.

Before HARLAN, Circuit Justice, and WOODS and JENKINS, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

It is the duty of the master to use ordinary care to furnish machinery and appliances reasonably safe and suitable for the use of the servant, such as with reasonable care upon the part of the servant can be used without danger except such as is incident to the business in which such instrumentalities are employed. So, also, is it the duty of the master to provide a reasonably safe place in which the servant may perform his work, and to keep it in such suitable condition. This duty is not absolute, but relative. It is measured by the nature and character of the employment, the location of the premises and their surroundings. There are employments that of themselves are necessarily dangerous, in connection with which no position can be made secure. In such case the law requires of the master that he shall use ordinary care that the dangers of the employment are not unnecessarily enlarged; that he shall take proper care to furnish such safeguards as are customarily employed in the performance of like hazardous service, so that the servant, exercising proper care, may render his service without exposure to dangers that are not within the obvious scope of the employment as usually carried on. Coombs v. Cordage Co., 102 Mass. 572; Burke v. Anderson,

34 U. S. App. 132, 16 C. C. A. 442, and 69 Fed. 814. The master may, however, conduct his business in the way that seems to him best, although other ways may be less hazardous. In such case, if the servant knows the danger attendant upon such manner of prosecuting the work, he assumes the risk of the more hazardous method. Tuttle v. Railway Co., 122 U. S. 189, 7 Sup. Ct. 1166; Southern Pac. Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530; Naylor v. Railway Co., 53 Wis. 661, 11 N. W. 24; Stephenson v. Duncan, 73 Wis. 404, 41 N. W. 337; Sweet v. Coal Co., 78 Wis. 127, 47 N. W. 182; Casey v. Railway Co., 90 Wis. 113, 62 N. W. 624; Sullivan v. Manufacturing Co., 113 Mass. 396; Gilbert v. Guild, 144 Mass. 601, 12 N. E. 368; Crowley v. Pacific Mills, 148 Mass. 228, 19 N. E. 344; Coullard v. Tecumseh Mills, 151 Mass. 85, 23 N. E. 731; Railroad Co. v. Lyons, 119 Pa. St. 324, 13 Atl. 205; Anderson v. Lumber Co., 47 Minn. 128, 49 N. W. 664; Michael v. Stanley, 75 Md. 464, 23 Atl. 1094; Rietman v. Stolte, 120 Ind. 314, 22 N. E. 304. The servant, on his part, assumes the natural and ordinary risks attendant upon his employment. He does not, however, assume unusual and extraordinary risks of which the master knew or should have known or foreseen, unless such risks are obvious, or the servant has actual or presumed knowledge of the danger. It is the duty of the servant to use ordinary care to ascertain the dangers attending the service in which he engages, and to protect himself against known dangers, and such as can by ordinary care be ascertained. This duty is as imperative upon him as is the duty laid upon the master. Wormell v. Railroad Co., 79 Me. 397, 10 Atl. 49. When the servant is required by the master to perform temporary service beyond and without the scope of that which he has engaged to do, a question of somewhat different nature is presented. The master may not lawfully expose his servant to greater risks than those pertaining to the particular service for which he has engaged, and against which the servant, through want of skill, or by reason of tender age or physical inability, could not presumably defend himself, if unapprised of the danger. He is bound to warn the servant of the danger if it be not obvious, and to instruct him how it may be avoided. If, however, the servant be of mature years, and of ordinary intelligence and experience, he is presumed to know and comprehend obvious dangers. In such case the master is not liable for injury happening to the servant in the performance of dangerous work without the scope of his engagement for service, merely because he has been directed by the master to perform such work. If the servant is possessed of knowledge and experience sufficient to comprehend the danger, and without objection undertakes the service, the master is not liable for injury received by the servant in such new and more dangerous employment. Cole v. Railway Co., 71 Wis. 114, 37 N. W. 84; Paule v. Mining Co., 80 Wis. 350, 50 N. W. 189; Dougherty v. Steel Co., 88 Wis. 343, 60 N. W. 274; Buzzell v. Manufacturing Co., 48 Me. 113, 121. The liability upon the master in cases of injury to the servant received in a dangerous employment outside of that for which he had engaged arises, therefore, not from the direction of the master to the servant to depart from the one service and to engage in the other

and more dangerous work, but from failure to give proper warning of the attendant danger in cases where the danger is not obvious, or where the servant is of immature years, or unable to comprehend the danger.

It becomes our duty to inquire, in ruling upon the request to direct a verdict, whether, upon the testimony produced by the plaintiff below, a case of liability upon the part of the master was made out. Upon any review of the evidence for that purpose, while the burden of proof was upon the plaintiff, we should read the evidence in the light most favorable to him; and if the facts are not clear, and if there are inferences to be indulged, it was within the province of the jury to pass upon the case under proper instructions from the court. There was here, however, no evidence introduced in opposition to the case made by the plaintiff, and the substantial facts upon which our judgment must proceed are established beyond controversy. Stockmeyer, in his native country, was a farm laborer. He emigrated from Germany to this country at the age of 24 years, and some three years before the accident in question. For over two years prior to the injury he had worked in and about stone quarries as a scabbler, and also in cleaning out quarries. He had also worked at stripping; that is, removing the earth from the top of the rock to enable the men to get at the rock and channel it. He first worked for about one year at the Blue Hole quarry owned by Mr. Thornton, then at the quarry of Mr. Reed for about eight months at scabbling, then at the quarry of one Torpy for about two months. He then returned to the service of Mr. Reed, and was there employed for some four months prior to the injury. He states that he applied for work to Drehoble, the foreman, upon the occasion of his second employment at Reed's quarry, and was informed that there was no work then of scabbling, but that he might engage in the work of stripping, and after a time he would be given work at scabbling. This promise was fulfilled, and he continued in the work until the day of the injury. About 5 o'clock on the evening of that day, having completed the work then in hand, he applied to Drehoble for more stone upon which to work, and was told there was no more ready, and "was then ordered to go down in the hole to break up the first cut." This cut was six feet six inches high, four feet wide, and thirty feet long. He and Bauer, a co-servant, went to the place, and put wedges in the channel cut in the surface of the rock, and commenced to hammer and break one end of the cut. What he did is thus stated in his own language:

"I was on the ledge twenty or thirty minutes before Drehoble came up. I and Joe Bauer put the bull wedges in there. I did that all through the whole channel. I had to stoop down in order to get those wedges. I had good eyesight at the time. I could see just where those channel cuts were, and where to put those wedges in. I could see to put the wedges in the cut. The mud is as thick as this [indicating with his hand] there on top of the stone. That was above the wedges. I put the wedges in the cut in the solid stone. I thought I put the wedges right into the cut. I don't know exactly how many times I hammered those wedges, but I think two or three times. I don't know exactly how many times before Bauer hammered them. Joe Bauer first began to hammer, and then I took the hammer, then Joe took it back again, and then afterwards Linck came and hammered a little while,

and Joe came and hammered a little. * * * I put those wedges in that cut just as I had seen them put before."

After so working about 30 minutes on the ledge, Drehoble came, and, after attempting in vain to break the cut by hammering, directed Stockmeyer "to go down in the hole and clean it out"; that a steam drill might be used below to drill a hole in the stone. Stockmeyer went down as directed, and was engaged in clearing out the hole for the purpose stated. Drehoble commenced hammering upon the wedges, and while so employed a piece of the stone, by reason of a seam in the rock, slid off the cut, and fell upon Stockmeyer, inflicting the injury complained of; Drehoble falling with the piece. While at work at Thornton's quarry a year or more prior to the accident, Stockmeyer learned that seams existed in stones, rendering them liable to break; and at times was engaged at that quarry and at the Torpy quarry throwing over cuts. He testified with respect to his work upon the cut upon the day in question, "I had often turned over a rock where the wedges were still in the cut, and I did it according to that way." He said that he did not know that this particular stone had any seams in it, but he testified:

"I know what seams mean. I did know of other stone with seams from the rear of that quarry. I don't know how many seams. I learned that when the stone breaks off. I don't know that this quarry had dry seams in it before the day I was hurt. I did know, while I was working there during the four months before I was hurt, that some of these stones had seams. I learned that fact from the people with whom I was working, and also from the stone as it broke off. I cannot give an estimate how often I seen the seams in that stone when it broke off. Sometimes there would be a sight of that kind in two or three weeks, then again not for a month. I don't know when I last saw seams in the quarry before I was injured. I don't remember any. I heard from the people with whom I was working that it had seams in it outside of what I saw. I don't know any more. I don't know how often. I heard it frequently. I saw seams there frequently as the stone was broken off. * * * I think every quarry has its seams. I think that because that is what people say. I saw it in the Torpy quarry at times when it broke off. I saw it also in the Blue Hole quarry. I did see a seam or seams of the same character in the Reed quarry. I knew all that before I began to hammer upon that stone that day with Bauer. I didn't know that this particular stone had any seams, but I knew these quarries all had seams. I did not make any examination of that ledge that day. It was not my work to look to see whether it had seams in it or not before I used the hammer. I did not attend to it. I did not look to see whether it had seams in it or not before I used the hammer."

There is perhaps some confusion in the evidence whether Stockmeyer was employed to work at any specific branch of labor in the quarry or generally. We assume, therefore, as most favorable to his contention, that he was employed exclusively for scabbling or stripping.

Robert Reed, the son of the owner, was superintendent of his father's quarries. He gave general directions with respect to the management of them to the foreman, Drehoble, from whom the workmen received their orders, he working with them, and personally assisting, daily, in their labors; and we assume—although there is some conflict in the testimony—that Drehoble employed

and discharged the men. It follows, therefore, that in the hiring of the men and in the direction to Stockmeyer to engage in work without the scope of his original employment, Drehoble, so far as that duty was concerned, was the representative of the master, and a vice principal, and for whatever wrong, if any, he did in that capacity, the master was liable. It is nevertheless true that in the performance of manual labor in the quarry Drehoble was a fellow servant with Stockmeyer, and for his negligence, if any, in that capacity, the master cannot be held responsible. The question of the liability of the master, says the supreme court in Railroad Co. v. Baugh, 149 U. S. 368, 387, 13 Sup. Ct. 914, "turns rather on the character of the act than on the relations of the employés to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master; but if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable therefor." See, also, Railroad Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983; Railroad Co. v. Keegan (Dec. 23, 1895) 16 Sup. Ct. 269; Railroad Co. v. Peterson (April 13, 1896) Id. 843; Railroad Co. v. Charless (April 13, 1896) Id. 848; Railway Co. v. Rogers, 13 U. S. App. 547, 553, 6 C. C. A. 403, and 57 Fed. 378. We must therefore search to ascertain the wrongful act, if any, causing the injury, and whether that act was done by Drehoble in his capacity as vice principal, and in discharge of a duty which the master owed to the servant, or in his capacity as co-servant with Stockmeyer. The wrongful act which is here relied upon was the direction to Stockmeyer to work in a hazardous employment for which he had not engaged. We state the proposition in the language of counsel that there may be no misunderstanding of the position assumed. He says:

"The theory of the complaint is: (1) That the defendant in error was employed to do the work of scabbling, which was a safe employment, and its labor performed in a safe place. (2) That after being thus employed he was compelled by the plaintiff in error to quit that employment, and to engage in the work of assisting to break loose the stone in the quarry, and turn it from its bed. (3) While in so doing he was injured, without any fault on his part. The wrongful act upon the part of the plaintiff in error was in compelling defendant to incur a risk which he did not assume by his employment. The proposition of law of defendant in error is this: If a servant is employed to perform a certain class of work, by the very acceptance of such employment he assumes every risk that is incident thereto, when such work is properly conducted; and that, in order for him to have any right of action against the employer, he must show negligence, with which the master is chargeable, producing the injury. But the statement of the rule shows its limitations. The servant, by accepting employment in one department of work, while he accepts the risk incident thereto, does not accept the risks incident to another and more dangerous character of work, although conducted by the same employer; and hence, when the master calls such servant from the work for which he was employed, and the risk of which he has assumed, and compels his service in another and more dangerous department, and the servant receives injury, such servant is not required to show that there was any negligent conduct in the management of the particular work in which he was injured. If he receive injury from a danger to which he was exposed by the change of employment, he may recover, although no negligence on the part of the master, and even although such

risk would have been one assumed by a person accepting employment in such department. Under such circumstances the wrong of the master is in exposing the servant to a risk which he has not assumed."

It will be observed that counsel assert the broad proposition that there is liability here because the vice principal acting for the master directed the servant to engage in an employment other than that for which he was engaged, and which was more hazardous, and therein there was a breach of positive duty by the master; but, as we have seen, this proposition cannot be sustained in the broad language in which it is asserted. The liability does not arise from the direction, but from failure to give proper warning of the risks attendant upon the employment. The amended complaint seems to be wanting in any allegation of failure to give such warning, unless it may be inferred from the statement that Drehoble knew of the danger, and that Stockmeyer did not. We are not, however, willing to rest our judgment upon any infirmity of pleading, or upon any defective statement by counsel of the principle of law which must govern the case. We proceed to inquire, assuming that no warning was given, whether the circumstances required a warning, and whether the dangers to be incurred were open and obvious, and such as could be comprehended by Stockmeyer, or were concealed, and were of such character that he should have been notified of them, and instructed how to guard against them. The only possible concealed risk arose from the presence of seams in the stone in the quarry. Stockmeyer was no novice in this work. He was a man of mature age, of ordinary intelligence, and for several years had been employed in and about quarries. His testimony shows beyond contention that for some two months during his previous employment by Reed he had worked at channeling stone; that he knew generally of the existence of seams throughout all the quarries in the neighborhood, and that the stone was liable to break by reason of the seams during the progress of the work of channeling and of cutting out the stone. He did not, it is true, know of seams in this particular block of stone; nor could Drehoble or the defendant in error know; and for the like reason,—that it was covered with earth and dust. He, however, knew the fact that seams existed in stone throughout the quarries, and the danger therefrom, and had equal opportunity with the master and Drehoble of ascertaining the existence of seams in this particular stone, for he, with Drehoble, had been at work upon it prior to the injury. All the warning that could have been required of the master, or of the vice principal acting for the master, was to call the attention of the servant to the possible existence of seams in this particular stone. But Stockmeyer knew that fact from his general knowledge of the character of the quarries. It was a fact of which he was bound to take notice. No warning could make the danger more manifest to him. The danger arising from this employment to which he was directed by the master was either obvious to the senses or was known to the servant as most likely to exist; and he had the sense and experience necessary to comprehend the danger and to

guard against it. There was consequently no breach by the master of any positive duty owing to the servant which produced or contributed to his injury. The evidence clearly discloses that the negligent act, if any, causing the injury, was that of Drehoble in hammering upon the wedges at the time when Stockmeyer was underneath the stone. That act was not the act of a vice principal. The injury did not result from any matter of control, but from the act, negligent or inadvertent, of a co-servant in the course of a common employment. In such case the master cannot be held liable, as was most clearly demonstrated in the able opinion of Judge Baker upon demurrer to the original complaint.

It is urged that Stockmeyer, in obeying the orders of Drehoble, acted under compulsion, and should not be, therefore, held to have assumed the risks of the work he was directed to perform. It is conceded that he made no objection to the order, that he did not protest any incapacity to comprehend the risk, but that he was coerced into compliance with the order through fear of discharge in case of disobedience. That, however, does not charge liability upon the master. In the absence of restrictive contract provisions, the master is at liberty to discharge the servant at any time. So likewise is the servant at liberty to abandon his service at will. The master has the right to demand other service than that for which the servant has engaged. The latter may accept or decline at will. Declining, he may lose employment; accepting, he assumes the risks attending the service, if he knows or has been properly warned of them. The servant is not under guardianship. He is a free man, at liberty to make such contracts as he will. That through stress of circumstances he consents to the orders of the master rather than be discharged from employment, does not impose liability upon the master because of such demand, if he has otherwise performed the duty which the law imposes upon him with respect to the servant. Leary v. Railroad Co., 139 Mass. 580, 2 N. E. 115; Dougherty v. Steel Co., 88 Wis. 343, 350, 60 N. W. 274. In the former case it is said that:

"The servant is presumed to be a free, moral agent, that he is competent to act and judge for himself; that it is optional with him to quit the service or perform the act required; and if he chooses the latter it must be considered as voluntary on his part."

In the latter case the court observed:

"The fact that Burns, the foreman, told the plaintiff, when he objected to working on the spindles driven by steam, 'Either go there or get out,' does not obviate the objection to the plaintiff's right to recover. If an employé of full age and ordinary intelligence, upon being required by his employer to perform duties more dangerous or complicated than those embraced in his original hiring, undertakes the same, knowing their dangerous character, although unwilling, from fear of losing his employment, and is injured by reason of his ignorance and inexperience, he cannot maintain an action therefor against his employer. Leary v. Railroad Co., 139 Mass. 580, 2 N. E. 115; Bradshaw v. Railroad Co. (Ky.) 21 S. W. 346; Woodley v. Railroad Co., 46 Law J. Exch. Div. 521."

The same rule must apply when the injury is caused by the act of a fellow servant. It is clear upon the record that the court

should have instructed the jury to return a verdict for the defendant.

It is proper to say that we have held this case under consideration awaiting the advice of the supreme court upon certain questions submitted in the case of Railway Co. v. Brown, not necessarily affecting the judgment here, but having a bearing upon the general relations of master and servant, that seemed to us desirable to be authoritatively and accurately stated. Failing to obtain the desired instruction, we have proceeded to the determination of this cause without that aid. It is also proper to say that since the argument of this cause Mr. Justice Harlan, who sat at the hearing, was by assignment withdrawn from this and transferred to the Sixth circuit, and did not participate in the decision.

The judgment will be reversed, and the cause remanded, with directions to award a new trial.