### SOUTHERN RY. CO. v. LOGAN.

(Circuit Court of Appeals, Fourth Circuit. May 9, 1905.)

#### No. 583.

MASTER AND SERVANT—INJURY OF SERVANT—ASSUMED RISK.

Plaintiff, who was employed as a conductor in the switchyards of defendant railroad company, in taking a dining car to a Y at a junction about a mile from the yards, in the nighttime, for the purpose of turning the same, placed the engine behind; leaving no light in front of the car, except a lantern, which he held in his hand while standing on the front platform. Other engines and trains were frequently on the tracks at the junction, and it happened on this occasion that an engine which had left its train on the Y was backing up to a coal chute, and a collision occurred between the tender and the dining car, in which plaintiff was injured. *Held*, that it was error to instruct the jury that plaintiff could recover, although the placing of the engine behind the car, instead of in

front, was more dangerous, if they found that he did so by direction of the yard master, who was his superior, since, even in such case, being familiar with the additional risk involved, he assumed the same, and could not charge defendant with liability for its result.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 561, 562, 648–650.

Assumption of risks incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

In Error to the Circuit Court of the United States for the District of South Carolina.

C. P. Sanders, for plaintiff in error.
Jos. A. McCullough, for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

PRITCHARD, Circuit Judge.   The defendant in error, who was a yard conductor in the service of the plaintiff in error at Spartanburg, S. C., brings this action to recover the sum of $20,000 for damages received by him while in charge of a "diner" which had been left at Spartanburg for the purpose of being turned, in order that it might be ready for the train which was due to pass Spartanburg at 7 o'clock each morning.   In order to turn this car, it was necessary to take it to the yard of the plaintiff in error, which was situated at the junction of the Asheville & Spartanburg Railroad with the main line running from Charlotte to Atlanta.   The Y was a little over one mile from Spartanburg.   The defendant in error was charged with the duty of turning the diner, and, in doing so, used a switch engine which was furnished him for that purpose.   This engine was provided with a headlight at each end, which was put there to enable the engineer to see obstacles on the track in time to prevent a collision.   The defendant in error had complete control over the movements of the engine and dining car between Spartanburg and the Y.   In going from Spartanburg to the junction Y, it was necessary that the operator at Spartanburg should notify the operator in the office of the plaintiff in error at the junction yard to hold the engines and trains at that point until the engine and cars leaving Spartanburg should arrive.   This office is situated at the northern end of the junction (the end nearest Spartanburg), while the Y was at the southern end of the junction yard (the end nearer Greenville).   On the night in question the operator at Spartanburg notified the operator at the junction yard to hold the engines and cars until the defendant in error in charge of the diner should arrive at that point.   On arriving at the office, the defendant in error, as conductor in charge, failed to report before proceeding beyond that point.   After leaving this point, the defendant in error, while in charge of the diner and engine, signaled the engineer to go at a greater rate of speed.   This signal was repeated twice.   The engine had been placed in the rear of the car, and the defendant in error was standing on the platform in front of the diner, with no light except his hand lantern.   On the night in ques-

tion an engine of the plaintiff in error, which had left its cars at the Y, was on the main line, and was running back towards the coal chute, and while running in this manner the engineer suddenly became aware of the approach of the dining car. He at once reversed his engine, but before he could start in the opposite direction the dining car struck the tender, which resulted in the injury to the defendant in error.

It is contended by the plaintiff in error that the court erred in using the following language in its instruction to the jury:

"* * * But under that testimony, if you believe that the yard master instructed him to move the engine in that way, the car being in front, although you might conclude that that was not the safest way to do it—it was clear that it was not the safest way—yet, if the yard master instructed him to use it that way, then no negligence can be imputed to him for using the engine in that manner; the yard master being superior in authority to the conductor. * * *"

There was evidence which tended to show that the defendant in error, in pushing the car in front of the engine, did so under the orders of the yard master. It was also in evidence that the movements of the car and engine were directly under his control and he had the right, if he chose to do so, to put the engine in front of the car, instead of pushing it. It does not appear that coercion was used by the yard master. Even if the yard master had directed the conductor to put the engine behind the car, and if such direction amounted to coercion, if at that time the defendant in error was aware of the risk which he assumed, he would be guilty of contributory negligence, and would assume any risk incident to carrying the car to and from the different points on the yard.

In the case of Reed v. Stockmeyer, 74 Fed. 194, 20 C. C. A. 388, among other things, it is said:

"It is urged that Stockmeyer, in obeying the orders of Drehoble, acted under compulsion, and should not be, therefore, held to have assumed the risks of the work he was directed to perform. It is conceded that he made no objection to the order; that he did not protest any incapacity to comprehend the risk; but that he was coerced into compliance with the order through fear of discharge in case of disobedience. That, however, does not charge liability upon the master. In the absence of restrictive contract provisions, the master is at liberty to discharge the servant at any time. So, likewise, is the servant at liberty to abandon his service at will. The master has the right to demand other service than that for which the servant has engaged. The latter may accept or decline at will. Declining, he may lose employment. Accepting, he assumes the risks attending the service, if he knows or has been properly warned of them. The servant is not under guardianship. He is a free man, at liberty to make such contracts as he will. That through stress of circumstances he consents to the orders of the master, rather than be discharged from employment, does not impose liability upon the master because of such demand, if he has otherwise performed the duty which the law imposes upon him with respect to the servant. Leary v. R. Co., 139 Mass. 580, 2 N. E. 115, 52 Am. Rep. 733; Dougherty v. Steel Co., 88 Wis. 343, 350, 60 N. W. 274."

While it appears from the evidence that it was the custom to push the car, it is conceded that it would have been much safer to have placed the engine in front, where the engineer could have had the benefit of the headlight; and the testimony shows that, if the engine had been in front, the headlight would have enabled him

to have discovered the approaching engine in time to have avoided the accident.

In this case there were two ways by which the defendant in error could have performed the services which were required of him. One of these was less hazardous than the other, but he chose to adopt the one which involved the greater risk, and in doing so he assumed all risks incident thereto. He was a man of mature years, and had been in the employment of the company for some time, and was thoroughly familiar with all the dangers with which he was surrounded while engaged in carrying the diner from the various points on the yard in the nighttime. He knew that after he passed the junction office the car was on a track which was frequently used by other engines and cars, and the manner in which he carried the diner over this particular portion of the track, with nothing but a lantern to indicate his approach, was attended with great hazard. Notwithstanding such knowledge on his part, he failed to report his arrival at the junction yard; and, after passing that point, instead of keeping his car under control, he signaled the engineer for a greater rate of speed, and although the engineer responded, and increased the rate at which they were going, he again signaled for more speed, and, as a result of such negligent conduct on his part, the car was moving so rapidly that it was a physical impossibility for the engineers to stop their engines in time to prevent the collision which occurred.

It has been repeatedly held that when one assumes employment at railroad yards, where there are many side tracks, and where trains and engines are constantly passing, he assumes the risk incident to the employment in which he is engaged. In the case of Randall v. B. & O. R. Co., 109 U. S. 482, 3 Sup. Ct. 325, 27 L. Ed. 1003, it is said:

"A railroad yard, where trains are made up, necessarily has a great number of tracks and switches close to one another; and any one who enters the service of a railroad corporation, connected with the moving of trains, assumes the risk of that condition of things."

In the case of Tuttle v. Milwaukee Railway, 122 U. S. 194, 195, 7 Sup. Ct. 1168, 30 L. Ed. 1114, it is also said:

"It is for those who enter into such employments to exercise all that care and caution which the perils of the business in each case demand. The perils in the present case, arising from the sharpness of the curve, were seen and known. They were not like the defects of unsafe machinery which the employer has neglected to repair, and which his employés have reason to suppose is in proper working condition. Everything was open and visible, and the deceased had only to use his senses and his faculties to avoid the dangers to which he was exposed."

Judge Cooley states the rule as follows:

"The rule is now well settled that, in general, when a servant, in the execution of his master's business, receives an injury which befalls him from one of the risks incident to the business, he cannot hold the master responsible, but must bear the consequences himself. The reason most generally assigned for this rule is that the servant, when he engages in the employment, does so in view of all the incidental hazards, and that he and his employer, when making their negotiations, fixing the terms and agreeing upon the compensa-

tion that shall be paid to him, must have contemplated these as having an important bearing upon their stipulations. As the servant then knows that he will be exposed to the incidental risk, 'he must be supposed to have contracted that, as between himself and the master, he would run this risk.'"

In view of the law and evidence in this case, the instruction of the Circuit Court to the jury to the effect that, inasmuch as the yardmaster had directed the conductor to push the diner with the engine, no negligence could be imputed to him, was erroneous. The court should have told the jury that, even though the defendant in error was moving the diner under the directions of the yard master, if they found that at the time he had knowledge of the risks that were incident to his employment, and that he assumed the same, they should find in favor of the plaintiff in error, or, if they should find that there were two means by which he could have moved the car, and that he adopted the one which involved the greater risk, that the defendant in error would not be entitled to recover.

For the reason stated, the judgment of the Circuit Court is reversed, and the case is remanded for a trial de novo in accordance with the opinion of the court.

Reversed.