GREAT WESTERN SUGAR CO. v. PRAY.

(Circuit Court of Appeals, Eighth Circuit.   December 20, 1908.)

No. 2,646.

MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENT USE OF APPLIANCE.

Where a master furnished an appliance for use by an employé, which
actual experiment demonstrated to be effective for the purpose of accom-
plishing the work, and not dangerous to the employé when carefully used
according to the directions given by the master, and the employé volun-
tarily accepted the same, and received an injury by not observing the
directions which he fully understood, as well as the danger of departing
therefrom, which was obvious, the master was not chargeable with neg-
ligence, nor liable for the injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Serv-
ant, § 759.]

In Error to the Circuit Court of the United States for the Dis-
trict of Colorado.

Charles W. Waterman (Joel F. Vaile, on the brief), for plaintiff
in error.

Harvey Riddell (L. R. Rhodes, on the brief), for defendant in er-
ror.

Before SANBORN and VAN DEVANTER, Circuit Judges, and
PHILIPS, District Judge.

PHILIPS, District Judge.   The defendant in error (hereinafter
designated the plaintiff) recovered judgment below in the sum of
$6,000 against the plaintiff in error (hereinafter designated the de-
fendant) for personal injury.   For some time prior to and on the
9th day of January, 1906, the defendant was the owner of and
operated a sugar factory at Ft. Collins, Colo.   Since the 3d day of
November, 1905, up to January 9, 1906, the plaintiff was in the
employ of the defendant; at first in and about the bins shoveling
and trucking sugar on the first floor, after which he went upon the
second floor, where the injury occurred, and was engaged in sweep-
ing, etc.   On the 27th day of December, 1905, he entered upon the
work of operating the machinery, consisting of two centrifugals,
Nos. 1 and 2, and so continued until the injury. These centrifugals
revolved from left to right, the construction of which was substan-
tially as follows:   There was an outer stationary metal cylindrical
shell about 30 inches high and 36 inches in diameter, permanent-
ly fastened to the floor.   The top of this shell or casing bent and
projected inward about 4 inches, forming a sort of hood; otherwise
the top of this shell was open.   Within this stationary metal shell
was the centrifugal proper, consisting of a metal basket, perforated,
and when hanging at rest, or when moving without vibration, was
about 4 inches from the outer shell aforesaid.   Inside of this basket
was a screen resting back close against the inner side of the basket,
made of wire, the apertures of which were about the size of a lead
pencil.   Inside of this screen was another wire screen or sieve,
fitting closely to the outer one, the apertures of which were about

the size of a pin. The basket and screens conforming to it were cylindrical in form. The basket at the bottom was attached to a smooth shaft or spindle 3½ or 4 inches in diameter, extending from the bottom of the basket up through its center to the gearing shaft above, from which the power of revolution was received. This shaft or spindle was attached at its upper end to this gearing, and at its lower end the basket was attached rigidly so as to revolve with the shaft. A little above the shoulders of the person operating the centrifugal was a friction brake and clutch, by means of which the centrifugal was operated, set in motion, stopped, and its speed regulated. The centrifugal when at full speed revolved at the rate of 800 to 1,000 times a minute. The device was for the purpose of forcing out the molasses or syrup from the mass of sugar; that is to say, the screens held inside of them the granulated portion of the sugar, while the motion of the centrifugal forced the syrup or molasses through the sieves outside of the basket and next to the outer case or shell, where it was kept apart from the granulated portion of the sugar. Above the basket to the right of the shaft was a spout by means of which the materials to be operated upon in the centrifugal were received from above and emptied into the centrifugal. The operator determined the amount of sugar to be received into the centrifugal, after which the centrifugal was thrown in gear, the circular motion started, and was continued until the complete separation of the syrup from the granulated mass. During the time the plaintiff was operating the centrifugal he had been using a long-spouted sprinkler for washing down the sugar on its inner surface, while the centrifugal was in motion at its heighth of speed. This was done by inserting the spout of the sprinkler to some extent inside of the centrifugal. On the day preceding the accident, as well as on that day, the plaintiff encountered some difficulty in separating the molasses or syrup from the granulated sugar in the centrifugals he was operating. For aiding the separation in question ordinarily there were, outside of the machine itself, steam pipes, with cocks, by means of which steam was conveyed into the centrifugals between the outer stationary shell and the basket, whereby to some extent it was forced against the surface of the sugar nearest the basket, through its perforations. This, on the occasion in question, did not prove sufficient to bring about a complete separation, and thereupon the assistant superintendent, Scranton, after investigation, concluded to inject steam into the inner surface of the sugar material in order to hasten and aid the desired separation,.by means of a steam hose which was attached to the steam pipe aforesaid.

The evidence was that when the centrifugals are "charged"—that is, loaded with sugar—the motion causes the sugar to climb the sides of the inner screen of the basket and distribute itself evenly on that surface. The steam hose in question was a thick 5-ply hose, with an orifice of 1¼ inches or 1½ inches, with a nozzle of an improvised gas pipe inserted some 6 or 8 inches, with an orifice of about an inch. This hose was from 30 to 40 feet, perhaps, in length. After attaching the hose to the steam pipe Scranton himself oper-

ated it for about an hour on the sugar in the centrifugals. This he did by inserting the nozzle end of the hose or gas pipe inside of the basket, and moving it up and down so as to apply the steam directly to the surface of the sugar on the left-hand side of the machine, the sugar revolving away from the point of application, holding the nozzle within two or three inches of the sugar. This method proved successful. The plaintiff was aware of what was being done by Scranton, who, after his experiment, delivered the hose to the plaintiff with directions to use it for the same purpose, in the manner he had used it, by holding the nozzle within two or three inches of the sugar. The evidence showed that after the plaintiff took the hose he used it for some time on both centrifugals, first on No. 2 and then on No. 1—where the accident occurred. Applied as Scranton used it, and as he directed the plaintiff to do, the steam, according to his testimony, was carried up by the revolving shaft without interfering with the vision in directing it. No one saw the accident, but the plaintiff testified that when he started to use the nozzle in No. 1 "something struck it and lopped it right around the shaft. It was just like a thunderbolt to me." In some unexplained manner his left arm was torn lose by this hose as it wrapped around the spindle. The explanation which occurs to us is that the plaintiff must have held the hose with his left hand so that that arm was around it, the hose being too inflexible to admit of wrapping it around the arm.

In its charge to the jury the court said:

"The plaintiff sues the defendant for damages on account of alleged negligence. That negligence, as charged in the complaint, and to which the case must be confined, is that the defendant furnished the plaintiff with a hose twenty-five or more feet long, to be used by him for the purpose of injecting steam into the so-called centrifugal, which revolved at the rapidity of 700 or more revolutions per minute. You will consider no other negligence so far as the defendant is concerned."

This charge was predicated of the following allegations of the complaint:

"That said hose and nozzle in manner and length as the same was furnished him with which to work was an unsafe and dangerous device; that defendant was negligent in furnishing this plaintiff with a hose of an extra length unnecessary to reach from the fitting in the steam pipe to said centrifugals with the nozzle, and by reason of this extra length of said hose the same was a dangerous device, and that said defendant was negligent and guilty of gross negligence in furnishing the same to this plaintiff with which to work, and that this fact was unknown to this plaintiff; that he did not know or appreciate the danger and hazard thereof, nor could he have by exercise of reasonable care known of the risk and hazard incident thereto; that he did not have opportunity to examine the same, and that he was deficient in knowledge, skill and experience in handling such device, and did not know nor could have known of the danger incident to the use thereof with ordinary care and observation."

While the defendant excepted to the foregoing charge of the court, inasmuch as the plaintiff acquiesced therein and presumptively secured the verdict on that issue, he is in no position to gainsay it.

Exactly how the length of the hose, whether 10 or 40 feet, could be the basis of actionable negligence is not apparent. What had the

length of the hose to do with the wrench to the plaintiff's arm? Beyond question the accident came by reason of the nozzle held by the plaintiff, with his right hand forward and left back, being suffered to pass too far around the spindle, and to come in contact with the basket while revolving from 800 to 1,000 times per minute, thereby throwing it around the spindle. Had the hose been of just sufficient length to reach the lower part of the basket, in the nature of physical law, the effect would have been none the less forcible and disastrous. In performing the work there had to be more or less play for the hose. The plaintiff himself testified in this particular:

"From where we would have to raise the hose up out on the floor to get it above the machine we would have to have about 10 or 12 feet of hose raised clear off the floor in order to turn this nozzle into the machine."

If mere speculation is to be indulged, had the hose been just sufficiently long to reach from the point of connection with the steam pipe to admit of being freely worked up and down in the basket, had the heavy nozzle been suffered to pass so far around the whirling shaft as to be caught by it, the impact—the wrenching jerk—would probably have been even more violent, as there would have been less length and coil back of it for the play of the shock. The only danger in the use of the nozzle in doing the work designed lay in not keeping it free from contact with the revolving basket spindle. That was a fact so obvious to the average intelligent mind as to place it in the category of common knowledge. The plaintiff's testimony shows that he fully comprehended this fact:

"Q. And he [Scranton] told you to hold it down in there so that the end of the nozzle would be an inch and a half or two inches from the sugar? A. Two or three inches from the sugar. Q. You understood that to mean that you should not get the nozzle up next to the sugar? A. Of course I understood it. * * * Q. You didn't intend to get the hose so it would strike the sugar, did you? A. No, sir. Q. You were attempting to avoid that, weren't you? A. Certainly. Q. And you didn't intend to get that hose to touch against this revolving spindle or shaft on the centrifugal? A. No, sir. Q. You understood what directions Mr. Scranton did give you to mean that in the operation of this device—this hose—that you should avoid getting it in contact with any of the moving things inside of that centrifugal? A. Yes, sir; I think I understood him. Q. You knew enough to do that yourself, didn't you? A. Why, I think I would. Q. You knew enough to keep it away from these moving matters inside the centrifugal, yourself? A. Yes, sir."

This presents the very kernel of the plaintiff's right of recovery, even upon a broader ground based upon the allegation "that he did not know or appreciate the danger and hazard thereof, nor could he have by exercise of reasonable care known of the danger and hazard incident thereto; that he did not have opportunity to examine the same, and that he was deficient in knowledge, skill, and experience in handling such device, and did not know nor could have known of the danger incident to the use thereof with ordinary care and observation."

The plaintiff's testimony shows that he was quite familiar with the method of operating the centrifugals and their entire functions; he knew how to feed the sugar, and how to gear the machinery, and put it in motion; how to regulate its revolutions, and how to stop it. He

well understood the process by which the molasses or syrup was separated from the granulated sugar, and the facilitation of this end by the application of steam to the surface of the coagulated or hardened sugar. He not only understood the office of the steam pipe, arranged back of the basket, for aiding in this work, but he further understood that this appliance at times proved inadequate to the accomplishment of its purpose, and that in such contingency resort was had to the hand sprinkler, through the long spout of which the water was injected upon the sugar, in miniature manner of the application of the steam through the hose and nozzle. As he had so used such sprinkler in his work he had learned the size and depth of the basket, and how the application of the artificial steam should be applied to reach the sugar. He was further advised before the accident that on account of the condition of the sugar the effective operation of the centrifugals was interfered with, and the separation of the molasses and syrup was obstructed. He also knew that, to remedy this, Scranton, the assistant superintendent, resorted to the expedient of injecting steam upon the sugar surface by means of the hose and nozzle. With that appliance Scranton himself worked for about one hour, with successful result. And that the plaintiff knew what Scranton was doing is too palpable for tolerant cavil. At the end of this experiment Scranton told the plaintiff to continue the use of the hose.

Under such circumstances there is no foundation for invoking the doctrine of warning to a novice. There is not even an allegation in the petition of the absence of such warning; and if it had been made it would be unavailing for the reason that Scranton advised the plaintiff how to use the appliance, which he admits. By actual experiment just made, Scranton had demonstrated the safety of the appliance in the manner suggested to the plaintiff. That there was no probable, necessary danger in so using it is demonstrated by the fact that the plaintiff used it successfully on centrifugal No. 2, just before he turned to No. 1. As shown by his testimony above, he knew that he was not to place the nozzle against the sugar, and that it would not do to allow the nozzle "to touch against the revolving spindle or shaft on the centrifugal," and that Scranton so gave him to understand. He, therefore, not only had due warning, but was advised and understood how to avoid the danger. As no harm could come to him save by disregarding instructions and carelessly handling the appliance, the case-made is this: The master furnished an appliance which actual experiment demonstrated to be effective for the purpose of accomplishing the work, not dangerous to the employé when carefully used according to direction given by the master, which the employé voluntarily accepted, and received an injury by not observing the directions, when the danger of departing therefrom was plainly obvious to his senses. As applied to such situation, the law is that:

"The master is not liable for injury happening to the servant in the performance of dangerous work without the scope of his engagement for service, merely because he has been directed by the master to perform such work. If the servant is possessed of knowledge and experience sufficient to comprehend the danger, and without objection undertakes the service, the master is not liable for injury received by the servant in such new and more dangerous

employment. Cole v. Railway Co., 71 Wis. 114, 37 N. W. 84, 5 Am. St. Rep. 201; Paule v. Mining Company, 80 Wis. 350, 50 N. W. 189; Dougherty v. Steele Company, 88 Wis. 343, 60 N. W. 274; Buzzell v. Manufacturing Company, 48 Me. 113–121, 77 Am. Dec. 212. The liability of the master in cases of injury to the servant received in a dangerous employment outside of that for which he had engaged arises, therefore, not from the direction of the master to the servant to depart from the one service and to engage in the other and more dangerous work, but from failure to give proper warning of the attendant danger in cases where the danger is not obvious, or where the servant is of immature years, or unable to comprehend the danger." Reed v. Stockmeyer, 74 Fed. 186, 188, 190, 20 C. C. A. 381; O'Connor v. A. T. & S. F. Ry. Co., 137 Fed. 503, 70 C. C. A. 87.

While the law devolves upon the master the duty of exercising ordinary care to furnish the servant a reasonably safe place in which, and reasonably safe machinery or appliances with which, to work, the responsibility of the master attaches for injury "through a defect of machinery which was or ought to have been known to him, and was unknown to the employé or servant." Washington & Georgetown Railroad Company v. McDade, 135 U. S. 554, loc. cit. 570, 10 Sup. Ct. 1044, 34 L. Ed. 235. In other words, the master is not liable for the consequences of danger, but only for the consequences which ensue from his negligence. Smith v. Foster, 93 Ill. App. 139, 140. So that, when conducting his business in a way that seems to him best, although a different way may be less dangerous, he furnishes the servant machinery or appliances reasonably safe for the servant's use, "such as under reasonable care upon the part of the servant can be used without danger except such as is incident to the business in which such instrumentalities are employed," he is not answerable for injury resulting from such use. Reed v. Stockmeyer, supra; The Chico, 140 Fed. (D. C.) 568. The master has the right, in putting an adult, intelligent man at work with a given appliance, after explaining to him its use and operation, to rely upon the presumption that the servant will observe the directions, take cognizance of obvious dangers, and will exercise due precaution and care in the use of the appliance to avoid dangers. American Bridge Company v. Seeds, 144 Fed., loc. cit. 609, 75 C. C. A. 407, and authorities cited.

Though no such fact is alleged in the petition, the plaintiff in extenuation of his act in suffering the nozzle to so pass around the revolving spindle as to come in contact therewith, whereby the severe wrench came to his arm, testified that the steam so filled the cage that its fumes blinded him. If he discovered, from the manner in which he was applying the nozzle, that the steam spread and rose so as to prevent him from determining where the nozzle was in the basket, the dictates of the sense of self-preservation should have impelled him to withdraw it and to decline to use it. The danger of holding the nozzle, consisting of a rigid piece of pipe eight inches long, attached to a hose two inches or more thick, near to a spindle shaft revolving at the rate of 800 to 1,000 times per minute, when by reason of the fumes of steam in the basket he could not see where the nozzle was, presented such an obvious danger as constituted a gross act of negligence, making him the author of his own misfortune. However sincere may be our sympathy for this unfortunate man, and however strong may be his

claim upon the defendant for some charitable provision, our office is simply to declare the law as we find it to be, and to follow where it leads.

It is our conclusion that the request made by the defendant at the close of the evidence for a directed verdict should have been granted. It is, therefore, unnecessary to pass upon other assignments of error urged for consideration.

It results that the judgment of the Circuit Court must be reversed, and the cause remanded, with directions to grant a new trial.