# CHARLESTON.

## FERGUSON v. MIDDLE STATES COAL & COKE CO.

### Submitted May 2, 1916.   Decided May 23, 1916.

1. MASTER AND SERVANT—*Injuries to Servant—Machinery and Appliances—General Usage.*

   A master will not be charged with liability for injury to a servant, attributed to defects in machinery or appliances, where the instrumentalities employed are in construction and operation similar to those commonly used and regarded as safe by other employers in like service, and the injury is such as reasonably could not be anticipated by the master save as the result of the negligence of a fellow servant of the injured employee.  (p. 468).

2. SAME—*Injuries to Servant—Warning and Instructions to Servant—Duty of Master.*

   While a servant temporarily transferred to work not within the scope of but more dangerous than his regular employment is not presumed to know or assume the peculiar risks of the new service, and in the absence of instruction or warning by the master is entitled to assume the new perils are no greater than those that attach to his regular work; yet if the master and servant have equal knowledge of the new dangers, and they are such as the adult servant had capacity readily to appreciate and understand, failure to warn and instruct will not generally impose liability for a resultant injury.  (p. 468).

Error to Circuit Court, McDowell County.

Action by S. J. Ferguson against the Middle States Coal & Coke Company.   A verdict for defendant was set aside on motion of plaintiff, and defendant brings error.

*Reversed, and judgment entered for defendant.*

*Anderson, Strother, Hughes & Curd* and *Strother, Taylor & Taylor,* for plaintiff in error.

*Russell S. Ritz* and *Hairston, Hairston & Woodrum,* for defendant in error.

LYNCH, JUDGE:

The plaintiff, while in the service of the defendant, received the injuries for which he sued. The jury found against him upon all the evidence introduced upon the trial. This verdict the court set aside upon his motion, and the defendant obtained this writ.

The defendant at the time of the injury was engaged in mining and marketing coal from a shaft mine at Unger, McDowell county. The shaft is perpendicular and 185 feet deep. It is lined in part with a stone wall, and in part by heavy timber, to prevent undue water seepage, the corrosion or crumbling of the earth, and the subsidence of the different strata through which the excavation was made. The employees enter and retire from the mine, the equipment and material necessary for the mining operations of the plant are carried into the mine, and all the coal mined is removed from it, through the twin elevators operated in the shaft. The motive power is generated at a power house, and controlled by the employee to whom this function is assigned. He knew by the indicator provided for the purpose the exact situation of the cages, whether at rest or in motion, and, if either, the position they occupied. Between them and the shaft walls was left unenclosed a clearance space, as an aid to ventilation.

The engineer in charge of the constructive work necessary for the successful mining operations directed plaintiff to remain at the bottom of the shaft or mine floor, on the day of the injury; and superintend the removal and replacement of steel rails to be used to repair or extend the trackage in the mine, as they were lowered in the elevator. The length of the rails, as estimated by the witnesses, varied from twenty to thirty feet, the weight from twenty to twenty-five pounds per foot. The method adopted for loading the rails was first to lower the cage a short distance below the surface, hoist each rail so as to permit it to pass partly over the cage cross beams onto the cage floor, and to stand them endwise therein in a slanting position, supported by the hood of the cage. To prevent their slipping, a piece of timber, variously identified as a mine cross-tie, a two by four scantling, or a two by six joist, securely was nailed or bolted to the front edge of the cage

floor. They were held in place by employees standing on the hood and floor of the cage while it passed down the shaft to the mine level, and were removed from the carriage by raising the ends over the improvised guard rail onto the mine floor and by a gradual hoisting of the elevator cage.

While plaintiff was assisting in replacing the first cage load lowered, to a position convenient for haulage into the mine as and where the rails were needed, and while his co-employees were reloading the cage at the top of the shaft, they negligently permitted a rail to escape over the guard rail in the cage and fall down the shaft, where its weight and momentum caused it to sink into the sump at the base of the shaft or into the mine floor, and crumble or buckle and inflict severe but not serious injury upon him. The concussion lacerated the scalp by one or more incisions as if made by the edge of a sharp instrument, fractured two metacarpal bones of the right hand, hurt his back, and, he testified, rendered him unconscious, impaired his ability to engage in any employment necessitating the active use of the right hand, and delayed the resumption of work of any character for several weeks thereafter. The extent of the injury, its physical impairment, and the consequential deferred activity, as claimed by plaintiff, the witnesses for defendant deny. These include the physicians and surgeons who saw and attended him immediately after the accident and while he remained as a patient in the miners' hospital at Welch, some of whom denied he was unconscious when they saw him soon after he was brought to the top of the mine shaft.

There is the same diversity in the proof as regards the service plaintiff was employed to perform. He says he was to serve in the capacity of motor boss, the duties of which position required him to see that the motors were kept in repair and to expedite the haulage to the elevator shaft of the coal as it was mined. But Osborne, the mine foreman, who employed him and under whose direction he worked, says "he was there to help me at anything. The mine was large, and I couldn't cover it all in one day; and the first morning he came to work I told him he would have to take one side of the mine and I would take the other, but more particularly to pay

attention to haulage, as we were having trouble with it—whenever he caught motormen loafing to jack them up so that the coal got to the bottom'' of the shaft. His designation as ''motor boss'' was merely a title. It signified nothing.

The precise negligent omissions presented as elements of the cause of action averred are the failure to enclose the clearance spaces between the elevator cages and the front and rear shaft walls, and the change from one employment to another, fraught with greater perils, without warning of the new hazards or instruction as to the safest method to avoid them.

The evidence relating to the necessity and safety of the shaft construction and elevator equipment, though somewhat conflicting, apparently preponderates against the contention that they were defective or the operation thereof necessarily fraught with serious consequences to the employees. The proof affirming the adequacy of the construction, the necessity for the open spaces as aids to proper ventilation of the mine, and the sufficiency of the plant equipment, outweighs that to the contrary. Those who so testify say the openings assigned as faulty or dangerous, while not indispensable, are usual and customary in the operation of shaft mines. The force of this proof is offset, if at all, only by the statement that some shaft mining operations are conducted without such open spaces. None such, however, were specifically named. Witnesses merely said they had seen them; and no one ventured to suggest with any degree of certainty that it was practicable to enclose the cages so as to prevent the possible or probable falling of the rails while being loaded for carriage down the shaft into the mine, although they thought such enclosures were feasible.

But plaintiff contends that, as the employment in which he agreed to serve the defendant was wholly different and less dangerous than that in which he was engaged when injured, the law imposed upon the employer the duty of forewarning him of the dangers attendant upon his changed situation, and of instructing him as to the safest method of protecting himself from such perils, agreeably to the rule that, although the servant impliedly assumes the ordinary risks of the employ-

ment, including the dangers incident to the negligence of co-servants, yet if he be ordered by a superior officer or agent of the master to engage temporarily at service in a different department, where the work to be performed is so fraught with danger that it can not reasonably be said to be within the scope of the original employment, he does not, by obeying, necessarily assume the hazards of the temporary service; or, as said in 1 Shear. & Red. Neg. §207i: "In many cases it has been said, in general terms, that a servant does not assume the risks attendant upon service he is called upon to render outside of his regular employment and more hazardous. * * A servant thus directed to undertake work outside of that which he had engaged to do is not presumed to be aware of its peculiar risks. And therefore, if the master does not fully explain them to the servant before putting him at such new work, the servant is entitled to assume that it has no greater risks than those which attach to his regular work, either in the nature of the work itself or in the habits of fellow servants with whom it brings him into contact." *Reed* v. *Stockmyer*, 20 C. C. A. 381, 74 Fed. 186; *Coal Co.* v. *Haenni*, 146 Ill. 614; *Lehman Co.* v. *Siggeman*, 35 Ill. App. 161; *Railroad Co.* v. *Scott*, 68 Tex. 694; *Railroad Co.* v. *Lang*, 118 Ind. 579; *Railroad Co.* v. *Adams*, 105 Ind. 151; *Railroad Co.* v. *Bayfield*, 37 Mich. 210. But this rule, nevertheless, is subject to the reasonable limitation that no liability exists unless "the master knew or ought to have known of the defect causing the injury." If the new dangers are so obvious that a reasonably cautious adult servant is able to perceive and appreciate the perils involved, and is not impelled to act under such coercive influence as would in some circumstances excuse him, or his youth, inexperience or lack of capacity are such as leave it doubtful whether he had the capacity to understand and appreciate the danger, or some statutory regulation makes such warning and instruction proper or necessary, the servant "assumes the risks of the new work to the same extent as he did those of his regular employment." *Wheeler* v. *Berry*, 63 Mich. 478; *McDonald* v. *Lovell*, 196 Mass. 583; *Coal Co.* v. *Haenni, supra; Lehman Co.* v. *Siggeman, supra.* And where the danger readily is discoverable by the servant, in

the use of ordinary care, aided by such knowledge, experience and judgment as a competent servant, such as evidently the plaintiff possessed, and hence had capacity to understand and know the dangers to which he is exposed, a failure to warn and instruct does not generally render the master responsible for the resultant injury.   Cases cited.

Although the plaintiff avers the negligent employment of incompetent servants, that averment is not supported by any proof offered or admitted.   No evidence tends to show any lack of care in assembling the employees, or want of the usual skill and competency in the performance of the tasks assigned to them.   The negligent act averred and relied on resulted from the use of excessive force in the hoisting or pushing the rail into the cage when it was being loaded with rails the second time preparatory for carriage to the mine level.   The injury therefore was the direct consequence of the negligence of a fellow servant.   That such an injury might occur the master had no means of knowledge the plaintiff did not also possess.   Both were equally competent to discern or suppose an accident such as did occur necessarily would happen if the employees engaged in that service were careless or negligent.   But, as all these questions of fact were determined by the jury to which they fairly were submitted, adversely to the claims of the plaintiff, we perceive no reason justifying the order vacating the verdict.   To us it seems plainly right, and that no other finding could justly result from the facts proved.

This view renders unnecessary any reference to the instructions, further than to observe that an examination reveals no substantial error in the rulings thereon.   However, if erroneous, and the verdict be, as we think it is, such only as could have been returned in view of the evidence, owing to its conclusiveness, the rulings thereon would be disregarded as harmless.   *Reilly* v. *Nichol,* 72 W. Va. 189.

For reasons stated, our order will reverse the judgment awarding a new trial, reinstate the verdict, and enter judgment thereon for the defendant.

*Reversed, and judgment entered for defendant.*