## Johnson and Wife *versus* Bruner.

1. Where an injury happens to a servant in the course of his employment, the master is responsible if it was caused by his negligence.

2. If an injury to a servant is the result of the hazardous nature of the employment, without any fault of the master, he is not liable, but if his negligence was the direct and proximate cause of the injury, he is responsible whether the business was hazardous or not.

3. If the misconduct of the servant or his omission of a duty defined or prescribed by law contributed to his injury there would be no question for the jury.

4. Negligence is always a question for the jury when there is any doubt as to the facts or the inferences to be drawn from them.

February 5th 1869. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., at Nisi Prius.

*absent.*

Error to the District Court of *Philadelphia*: No. 126, to January Term 1869.

This was an action on the case, commenced September 25th 1866, by Thomas Johnson and wife against James P. Bruner for negligence which caused the death of a son of the plaintiffs, a lad of about fourteen years of age, who was in the employ of the defendant, a manufacturer of woollen goods. The lad was employed in the fourth story of the factory and fell through an open hatchway to the lower floor of the building, a distance of about sixty feet. The fourth story was divided into two main rooms. The northern room contained the carding-machines and spinning-mules, and was about twice as large as the southern room. In the northwest corner of the southern room was a small room called the "waste-room." The doorway between the main rooms was in the centre of the partition. In the north room directly opposite the door and about six inches from it was the hatchway, which was about five feet square. The doors of the hatch opened east and west from the middle and it had no guard around it. The door of the waste-room was at its north-east corner, opened into the south room, and was within a very short distance from the door through the main partition. The lad was engaged at a card, which was on the west side of the room and was the first from the hatchway; between the card and the hatchway was a wool-box also on the west side of the room, two feet south from the card and facing it. The back of the box was seven feet high nearest the hatch and three feet high opposite the card.

William Reeves, a "stripper" in the employ of the plaintiffs, testified: "The boy fell down the trap about 5½ o'clock P. M., in July 1866. He was working with me at the first card; he could only see the hatch when he came to the east corner of the wool-box. He had swept around the card and gathered an armful of waste. He took that across the trap-door into the waste-room;

[Johnson v. Bruner.]

came back for more; gathered up another armful and started off to the waste-room. The trap-doors were both thrown back. That was the last I saw of him. He fell down the hatchway. When he crossed the trap and came back, it was as speedily done as he could walk back and pick up the armful of waste. Scarcely no time elapsed rom the time he had crossed the trap-door until he fell. The trap-door and hatchway were dangerous. There was never any notice given when the hatchway was open; there was no notice given that it was open at the time the boy Johnson fell."

On cross-examination he said: "When the trap-door was open a person could see it, if he was looking down at his feet. It was the usual time for opening it to lower the waste. The boy had been there, to my knowledge, four or five weeks. During all the time he was employed in this room. The picker-boy opened the trap-door. He generally opened it. The boy Johnson had a small armful of waste. It reached up to his breast. He might have passed the trap-door on the east and on the west side, but he could not pass round it. There was no room to pass on the south side. He had to pass over the trap-door to get to the waste-room. The space between the trap-door and the door leading to the waste-room is about six inches."

John Stead, a "picker-boy" in the employ of the defendant, testified: "The accident happened about 5½ o'clock in the afternoon. I was tying up dirt or waste to take down stairs—down the hatchway. Johnson brought an armful of waste to the waste-room. He went back to take another, and then he fell. I was in the picker-room when he fell. I had opened the west door of the hatchway; the east door was down. I had drawn a bag of waste and left it in the door, and went back for another. It was then he fell. I gave no notice that I had opened the trap-door. There was no one helping me to lower the waste. On other occasions there was always some one helping me. I knew the hatchway was dangerous. There is now a protection to the hatchway, but not all the way round. The building is a pretty old one. The trap-door is the same in all the stories. The business could not be carried on without the hatchway. It was the usual hour of opening the trap-doors. It was the daily practice to do so. The boys generally carried the waste. The first armful that Johnson carried was a large one; the second was a small one. There was no particular time fixed for lowering the waste down the hatchway. I always did it between 5 and 6 o'clock; sometimes at 5 o'clock, sometimes at 5½ o'clock, and sometimes later, just as I had the time. There was no particular time to do it. I did not see Johnson when he had the second armful. I picked up the waste at the bottom of the hatchway the next morning, and from what I gathered, I say he had a small armful."

[Johnson *v.* Bruner.]

The plaintiffs having closed their case, the court (Stroud, J.) ordered a nonsuit to be entered.

This, on removal of the case into the Supreme Court by the plaintiffs, was assigned for error.

*T. K. Finletter*, for plaintiffs in error.—There was evidence of negligence to go to the jury. An employer is guilty of negligence and liable for injuries happening to his employee in the course of his employment, if he do not use suitable means and instruments to carry on his business : Hutchinson *v.* York, N. C. and Berwick Railway, 5 Exch. 343 ; Seare *v.* Lindsay, 103 E. C. L. R. 437 ; Barton's Hill Coal Co. *v.* Reed, 3 Macq. 266 ; Patterson *v.* Wallace, 28 Eng. L. & Eq. 51 ; Marshall *v.* Stewart, 33 Id. 1 ; Noyes *v.* Smith, 28 Vermont 61 ; Buzzie *v.* Laconia M. Co., 48 Maine 113 ; Railroad *v.* Keavy, 3 Ohio St. R. 201 ; McGatuck *v.* Wason, 4 Id. 566 ; Keegan *v.* Western Railroad, 4 Seldon 180 ; Ryan *v.* Fowler, 24 N. Y. 410 ; Cayzer *v.* Taylor, 10 Gray 274 ; Snow *v.* Housatonic Railway, 8 Allen 441 ; Lackawanna & B. Railroad *v.* Doak, 2 P. F. Smith 379 ; McCully *v.* Clark, 4 Wright 408 ; Caldwell *v.* Brown, 3 P. F. Smith 453. In the absence of facts from which a deduction of contributory negligence can be drawn, the presumption is against him whose misconduct rendered the accident possible : Beatty *v.* Gilman, 4 Harris 468 ; Myers *v.* Snyder, Brightly R. 493 ; Bush *v.* Johnson, 11 Harris 209 ; Bears *v.* Ambler, 9 Barr 193 ; Phil. & Reading Railroad *v.* Spearen, 11 Wright 300 ; Oakland Railroad Co. *v.* Fielding, 12 Id. 320.

*W. L. Hirst*, for defendant in error.—When the material facts are ascertained, the question of negligence becomes exclusively a question of law : Evans *v.* Pitts. F. W. & Chicago Railroad, 3 P. F. Smith 254 ; N. P. Railroad *v.* Heileman, 13 Wright 63. Any contributory negligence will defeat the action : Cattawissa Railroad Co. *v.* Armstrong, 13 Wright 193 ; Heil *v.* Glanding, 6 Wright 499 ; O'Brien *v.* Railroad Co., 3 Phila. R. 80 ; Railroad Co. *v.* Norton, 12 Harris 469 ; Beatty *v.* Gilmore, 4 Id. 466 ; Horricks *v.* Railroad Co., 1 Phila. R. 28 ; McCully *v.* Clark, 4 Wright 399. A person who engages in a dangerous business takes the risk : Strange *v.* McCormick, 1 Phila. R. 156 ; Seymour *v.* Maddox, 16 Q. B. 326 ; Priestly *v.* Fowler, 3 M. & W. 1 ; Couch *v.* Steel, 3 Ellis & Bl. 402 ; Wigmore *v.* Jay, 5 Exch. 354 ; Ryan *v.* Cumb. V. Railroad, 11 Harris 384 ; Frazier *v.* Penna. Railroad, 2 Wright 110.

The opinion of the court was delivered, May 11th 1869, by

Williams, J.—This was an action brought, under the statute, by the parents of a minor son, to recover damages for his death, alleged to have been occasioned by the negligence of the defend-

[Johnson *v.* Bruner.]

ant.   The judge before whom the cause was tried ordered a judg-
ment of nonsuit to be entered, and the court in banc refused to
set it aside.   As no opinion was delivered in the case, we are left
to conjecture the ground on which the nonsuit was sustained.
But it must have been either because, in the opinion of the court,
the defendant was not shown to have been guilty of any negligence,
or, if he was, that the minor's own negligence contributed to his
death.   Can the judgment of nonsuit, then, be sustained on either
of these grounds?

It is well settled that where an injury happens to a servant in
the course of his employment, the master is responsible if it was
occasioned by his negligence.   If it was the result of the hazard-
ous nature of the employment, without any fault on the part of
the master, he is not liable; but if his negligence was the direct
and proximate cause of the injury, he is responsible, whether the
employment was hazardous or not.   These principles are so plain
and familiar that they require no argument or authority for their
support.   Was there, then, any evidence tending to show that the
defendant was guilty of negligence?   The plaintiffs' son, a lad
of about fourteen years of age, was employed by the defendant
in his carding and spinning-room in the fourth story of the build-
ing where he carried on the business of manufacturing woollen
goods.   He was working with the stripper at one of the cards,
and while carrying an armful of waste from the carding-machine
into the waste-room, he fell through an open trap-door or hatch-
way, a distance of sixty feet, to the bottom of the building, and
was killed.   The hatchway was in the carding and spinning-room,
immediately in front, and within six inches of the door-way
leading to the waste-room.   It was about five feet square, and in
going in and out of the room the employees had to pass over
it—there was no other passage.   There was no railing or pro-
tection of any kind around the hatchway, the trap-doors of which
were ordinarily kept closed, on a level with the floor, except when
it was in use.   All the witnesses describe it as dangerous, and
from its location, size, and proximity to the door, it could not
have been otherwise.   Was it not, then, the duty of the defendant
to have had a railing or other protection around it?  and was
he guilty of no negligence in permitting it to remain open—
without any notice or warning—to the hazard of the lives and
limbs of his employees?   Had the court a right to assume
that he was under no obligation to put any guard or barrier
around it, or to give any notice or warning when it was open for
use?   If the defendant was not absolutely bound to put up a
railing around the hatchway, was it not his duty to have a watch-
man stationed there to guard it whenever it was open, and give
notice of the danger?   And was it not negligence to intrust the
duty of opening and using it to a lad of so little experience and

[Johnson *v.* Bruner.]

discretion as the picker-boy? No attempt was made on the argument to show that the defendant was under no obligation to guard the hatchway, nor was it alleged that the death of the minor was not occasioned in part by his negligence. If the nonsuit was granted on the ground that there was no evidence of negligence on the part of the defendant, it was clearly erroneous. Was there, then, such evidence of negligence on the part of the deceased as to justify the court in withdrawing the case from the jury and determining the question as a matter of law? If it had been shown that his death resulted from the hazardous nature of his employment, then the court would have been justified in withholding the case from the jury; but it is not pretended that this was the cause of his death. He was not working at the hatchway at the time of the accident. If he had been lowering the waste, and by some mishap had fallen through the hatchway, then his death might be regarded as an accident, or result of the dangerous character of the business in which he was engaged, and as one of the risks which he or his parents assumed when he entered into the service of the defendant.

Again: if it had been shown that his misconduct contributed to his death, or that it arose from the omission of a duty defined or prescribed by law, then there would have been no question for the jury. But the evidence did not show that he was guilty of the omission of any defined duty, or of any misconduct whatever. On the contrary, he was in the discharge of his duty, and just where that required him to be, at the time he was killed. If there was anything in his conduct to prevent a recovery, it must have been negligence. This was his only fault, and negligence is ordinarily a question for the jury. It is always a question for their determination when there is any doubt as to the facts, or the inferences to be drawn from them. But the evidence may show a case of such clear negligence arising from obvious disregard of duty and safety, as to make it incumbent on the court to determine it as a question of law: Pittsburg and Connellsville Railroad Company *v.* McClurg, 6 P. F. Smith 294. Was this, then, such a case? It was if, as suggested on the argument, the deceased, in the broad daylight of a summer afternoon, with his eyes open, deliberately walked into an open hatch, and fell. But this leaves out of view, and wholly ignores, all the surrounding and attendant circumstances. It is true that the accident occurred in the broad daylight of a summer afternoon, but there is nothing to warrant the inference that the deceased saw the open hatchway. It is evident that he did not see it; and the only question is whether his failure to observe it arose from negligence or carelessness. What, then, are the facts as shown by the evidence? The card behind which he worked was about twelve feet from the hatchway. The wool-box at the side of the room was seven feet

high at the back and three at the front, and extended from the hatch to within two feet of the card. When the boy was at work it was impossible for him to see the hatch—he could see it only when he came around the corner of the wool-box. According to the testimony of the stripper with whom he worked, " He had swept around the card, and gathered up an armful of waste; he took it across the trap-door into the waste-room; came back for more; gathered up another armful and started off for the waste-room, and fell down the trap; when he crossed the trap and came back, it was as speedily done as he could walk back and pick up the armful of waste; scarcely no time elapsed from the time he crossed the trap-door until he fell." While he was gathering up the last armful of waste, the picker-boy opened the hatchway. He says:—" The accident happened about half-past five o'clock in the afternoon; I was tying up waste to take down stairs—down the hatchway; Johnson brought an armful of the waste to the waste-room; he went back to take another, and then he fell; I was in the picker-room when he fell; I had opened the west door of the hatchway; the east door was down; I had drawn a bag of waste and left it in the door, and went back for another; it was then he fell; I gave no notice that I had opened the trap-door; there was no one helping me to lower the waste; on other occasions there was always some one helping me; * * * the trap-door is the same in all the stories; * * * the business could not be carried on without the hatchway; there was no particular time fixed for lowering the waste down the hatchway; I always did it between five and six o'clock; sometimes at five o'clock, sometimes at half-past five o'clock, and sometimes later, just as I had the time." All the machinery was in operation, except the card at which the deceased worked. Was this, then, such a clear case of negligence as to justify the court in declaring it such as a matter of law? Was negligence the only and necessary inference from the facts? If no other possible inference can be drawn from them, it was the duty of the court to declare, as a matter of law, that the deceased was guilty of negligence. But if any other inference could be drawn from them, depending on the view which might be taken of them, then the evidence ought to have been submitted to the jury. The deceased, as we have seen, immediately before the accident had passed over the trap-doors, when they were closed, in safety. Had he any reason for supposing that they had been opened while he was gathering up an armful of waste? And if not, was it negligence on his part if he did not stop and look before he came to the hatchway? Would he readily have seen the open hatchway with an armful of waste? Would it not depend upon the bulk and the manner in which he was carrying it? Might it not have been so held that the open trap-door did not come within the line of his vision? And if so,

[Johnson *v.* Bruner.]

was there any negligence in his not seeing that it was open ?   If
these, and other questions which might be asked, are susceptible
of more than one answer, according to the view taken of the facts,
then the case ought to have been submitted to the jury.   When-
ever there is any doubt as to the facts, it is the province of the
jury to determine not only what they are, but what are the proper
inferences to be drawn fram them.   Without intending to intimate
what the finding of the jury should be, we are clearly of the
opinion that the court erred in withholding the case from them,
and ordering a judgment of nonsuit.

Judgment reversed, and a *procedendo* awarded.