# SECURITY CEMENT & LIME COMPANY, a Cor-
## PORATION,

### *vs.*

## WESLEY EUGENE BOWERS.

*Master and servant: duty of master; safe machinery; duty not to be delegated. Foreign statutes, as evidence: when admissible.*

Statutes of other States, opposed to the policy and statutes of the State in which suit is brought, or which are deemed unreasonable by the courts of that State, are not to be given force; but where such a statute of another State is not against the policy or the statutes of the State in which the trial is had, and where it is a statute which, presumably, was read into a contract of employment between the employer and employee, upon which, or because of which, suit is brought, such statute may be given in evidence.                                p. 20

An employee was injured in a West Virginia manufacturing plant of the defendant corporation, where lime and other materials were prepared from crushed stone; a suit for damages for the injury was brought in Maryland, where service upon the company was had; in the course of the trial a section of the Code of West Virginia was offered in evidence to show the duty of manufacturers, etc., in that State to protect employees from injury by dangerous machinery; *held,* that the statute of West Virginia was admissible.                    p. 20

It is the duty of an employer to provide his employees with safe machinery, and appliances, and a reasonably safe place for the work undertaken by them; and this duty is one which can not be delegated.                                    p. 16

· In a lime manufacturing plant there was a conveyer consisting of an endless screw that revolved in a trough, by revolutions propelling the substances that were to be crushed and ground; the trough was low upon the ground, and in a position where the employees were obliged to step over it; in some places opening had been made in the trough and had been covered by bags; the bag covering one of these openings was concealed by a deep layer of dust which had settled upon it, and an employee stepping over the trough in the prosecution of work for the company which he had been directed to do, not knowing that there was any opening in the trough, stepped upon the bag, and his foot going through, was caught in the screw and crushed: *Held*, that, under such circumstances, there was presented such a *prima facie* case of negligence on the part of the employer as to demand the submission of the question to the jury.                                    p. 18

*Decided June 26th, 1914.*

Appeal from the Circuit Court for Washington County. (KEEDY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*J. A. Mason* and *William J. Witzenbacher,* for the appellant.

*Frank G. Wagaman* (with a brief by *Wagaman & Wagaman*), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellee sued the appellant for injuries sustained by him as the result of the alleged negligence of the appellant. The appellant was engaged in the manufacture of lime and other products from crushed stone in Berkeley County, West Virginia. At the plant of the defendant there were two hydrated tanks and two ground lime tanks standing in a row, each of which was forty feet high and about fourteen feet wide. On top of the tanks there was what is known as a. screw conveyor, being a metal trough 12 or 14 inches high, and 10 or 12 inches wide, and in the trough there is a screw made of iron or steel on which there is a flange, like an auger, made of sheet iron or steel. There is a space of two inches between the conveyor and the tanks. The conveyor runs from an elevator, which brings the lime up, across the tanks and the lime carried by the conveyor is deposited in them through holes cut in them, over which there are slides. The conveyor runs north and south the full length of the tanks. There was a line shaft and some timber carrying it about five feet above the tanks. Between the two lime tanks there was a sprocket wheel and the elevator chain drive is on the east side.

A new conveyer was being constructed to run parallel with the old one. The appellee and three others were working there. The two ground lime tanks were known as Number 1 and Number 2. Elias Malott was standing by Bowers when he was hurt. He said: "We were on Number Two tank, cutting the hole, and we couldn't get it cut until we moved the new conveyor, and Mr. Conley said, 'You and Gene (Bowers) go over, and pull that conveyor ahead.' We were on the east side of it, we had to cross it, and then to cross back over the two conveyors; we had to cross because there is an elevator with a chain and a sprocket wheel on the east side, and we had to cross over it; we had to pass over the old conveyor down to the west side, and then come back and cross over to the east side." He said both conveyors were

there but the new one was not fastened; that the new one was about four inches from the old conveyor.

The conveyors were in sections and those of the new one were just east of the old one, over where the holes were to be cut. Malott said: "We moved it north to give them room to cut the holes, maybe three feet, moved one section." They had to go from the middle of one tank to the middle of the other and the plaintiff's witnesses testified that they could not go down on the side they were and hence had to cross over to the west side of the conveyors and then back to the east side. The line shaft was too low to permit them to stand up straight and in order to get over the conveyors Bowers put his hand on the old conveyor, and then put his foot down on it to step over. He stepped on a sack which was over a hole which had been left in the top of the old conveyor. He says he got his foot out but the sack caught it and dragged it into the hole of the conveyor where the screw was running. His foot went down on the east side of the screw and the screw forced it over to the west side—thus crushing his leg and foot terribly.

The conveyor was supposed to be covered on top with the same material as the other portions of it, but in some unexplained way a part of the top had slid or been moved, leaving an open space of possibly twelve or eighteen inches. although the exact size of the hole is not known. Over that space the sack had been placed. There is a good deal of lime dust about the conveyors and according to the evidence for the plaintiff there was from one and a half to two and a half inches of it on the sack, and Bowers claims he could not see that there was a sack there, or anything unusual. Malott said, "I could not see that the place was not covered, dust over it, it all looked alike, probably 2 to 2½ inches of lime dust over the sack and over the other portions of it." Conley said: "All covered with dust—I judge, 2 inches of dust there; I didn't see the sack." Izer said: "At time Bowers was hurt there was about 1½ or maybe 2 inches of dust on

everything up there." That was denied by the defendant's witnesses, but it was a question for the jury to determine. One witness said it would have taken three weeks for dust to accumulate to the depth of two, to two and a half inches. The superintendent of "the controlling end of the plant" said it would take a couple of months for two or three inches of lime to settle there. He did not think there could have been a sack there on the Sunday before the accident—he was not looking for bags but "was looking for holes in conveyors but saw none; looked for holes in any conveyor, as they are dangerous." He also said: "No excuse not to protect screw conveyors."

There can be no question but that there was abundant evidence on the part of the plaintiff tending to show that there was an opening in the top of the conveyor, which was covered with a sack, on which, as well as on the rest of the conveyor, there was considerable lime dust—sufficient to conceal the sack, and to cause anyone acquainted with the conveyor to believe that it was properly covered. Bowers testified that he thought it was solid. It was suggested that if Bowers could not see the sack, the other agents of the defendant could not have done so, but the superintendent's testimony shows that they undertook to keep it dusted.—had a man with a blow pipe, machinery was dusted Sunday and he had been there himself Sunday and said, "I would have seen bag if there on Sunday; not looking for bags, but had always looked around on top." It can scarcely be doubted that there was a sack or bag there at the time of the accident—four witnesses, besides the plaintiff, so swore. It was pulled out with the foot of the plaintiff, when he was released. One witness said, "I had seen a sack across the conveyor at that point a week or probably longer before," and another said, "I can state where he got hurt, but where the sack was I do not know; but where he got hurt, I know there were sacks there, in the immediate vicinity of that place; I saw sacks in those places about two or three weeks before Bowers was hurt."

Malott said he "could not notice that the top was off the conveyor while working around there, as there was dust all over there; all the same thing," and he also said Bowers "set his hand on the conveyor, and set his foot to go across and his foot went on down into the screw; it was necessary that he put his hand down, he couldn't step across and he couldn't stand up and step upon it, and he bent and just put his hands on it, and he put his foot up." Conley said, "Campbell and I crossed over the conveyor on tank No. 2; stepped on it; it was impossible for us to step two feet and raise fourteen inches; at that point both of the conveyors were together."

Keeping those facts in mind, there can be no doubt that the lower Court properly refused to take the case from the jury. The general rules of law applicable to master and servant are now too well settled to require the citation of many authorities, but it may not be amiss to recall some of the rules we have announced. In *Bernheimer Bros.* v. *Bager,* 108 Md. 551, we said: "It is a fundamental rule that the master must exercise ordinary and reasonable care to avoid unnecessary injuries to his servant in the course of his employment. While he is permitted to delegate to others certain duties there are some which he cannot relieve himself of, or avoid the responsibility for, if there be a failure to discharge them to the injury of the servant. One that is required of him, in this as well as in other jurisdictions, is providing and maintaining safe machinery and appliances and a reasonably safe place for the work undertaken by the servant. Necessarily there are some exception to these as well as to most general rules." In that case we quoted with approval as we had previously done what was said by the Supreme Court in *B. & O. R. R. Co.* v. *Baugh,* 149 U. S. 368: "A master employing a servant impliedly engages with him that the place in which he is to work and tools or machinery with which he is to work, or by which he is to be surrounded, shall be reasonably safe. It is the *master* who

is to provide the place and the tools and machinery, and when
he employs one to enter his service he impliedly says to him
that there is no other danger in the place, the tools and the
machinery, than such as is obvious and necessary." We gave
as illustrations of the exceptions above referred to, when a
place is out of repair and dangerous and the employee under-
takes to make it safe, and when he accepts an employment
or continues in it, with knowledge of the danger, the em-
ployee cannot ordinarily hold his employer liable.

Applying these principles to the facts of this case, the
plaintiff's first prayer was properly granted and the defend-
ant's first and second and its prayer 1-A were properly re-
jected.  There is nothing whatever in the evidence to con-
tradict the plaintiff, when he said he did not know that the
top of the conveyor was not solid, as it was supposed to be
and as the defendant claims it thought it was.  No witness
was more positive about the danger of conveyors than Mr.
Taylor, a superintendent of the company, and it may well
be inferred from his testimony that he regarded them so
dangerous as to inspect them himself.  He says he saw the
old conveyor the Sunday before the accident and denied
that there was then a collection of lime on the machinery or
that there was a sack there.  That was either the day before
or two days before the accident.  Bowers says the accident
was April 8th, which was Monday, while one of the wit-
nesses, according to the record, said it was on April 9th.
But there was not only some evidence, but abundant evidence
in contradiction of those statements of Mr. Taylor.  He is
also reported in the record to have testified that there was
"no excuse not to protect screw conveyors," and as it was
known that some of the employees would be working about
the old conveyor he would seem to be undoubtedly right in
that statement.  We can appreciate the difficulties that em-
ployers meet with at such a plant, but if the evidence on the
part of the plaintiff is correct—that sacks had been used on
this conveyor for a week or more, as one witness said, or two

or three weeks, as another said, and that the sack and other parts of the top of the conveyor were covered with so much dust that it would have taken several weeks to accumulate— Mr. Taylor said, "a couple of months"—it was inexcusable on the part of the defendant, and it did neglect its plain duty to correct the trouble, or at least to warn the employees of the existence of such a latent danger.

Whether such conditions did in fact exist was for the jury, as was also the question whether the plaintiff was guilty of contributory negligence. The Court could not say as a matter of law that it was negligence on the part of the plaintiff to place his foot where he did, if he believed the conveyor was covered, as it ought to have been, and as it usually was. The evidence certainly furnishes sufficient reasons for crossing where he did, and as he did, to require that to be submitted to the jury. The defendant's third prayer, asking the Court to take the case from the jury on the ground of contributory negligence of the plaintiff was therefore properly rejected. Its fourth, fifth, sixth and seventh prayers, which were granted, fully instructed the jury as to plaintiff's alleged contributory negligence, and its seventh was properly modified. Its eighth, which was also granted with a slight modification, was as favorable as the defendant could expect or ask. The ninth and tenth were properly rejected, and what we have already said will relieve us from discussing them.

In 2 *Labatt's Master and Servant*, 995th section, page 2668 of 2nd Edition, the effect of changes in the parts of machines is thus stated: "A servant may recover damages for an injury caused by the removal or alteration of some essential part of a machine, when the danger of using it is thereby materially increased. Hence, whatever doctrine may be entertained as to the existence of a duty on the part of the employer to keep dangerous machinery covered (see sections 975, 976, *ante*), the employer is *prima facie* liable for an injury resulting from the entire or partial removal of

a cover which had been provided. The conditions thus created are clearly more dangerous, because misleading, than those to which the servant is exposed when there has never been a cover at all. In such cases, therefore, the right to maintain the action is complete, and can only be defeated by showing that he understood and deliberately encountered the specific risks arising from the changed circumstances."

In reference to the master's duty under statutes relative to factories the same learned author in Volume 5, Section 1856, page 5665, says: "It is not sufficient for the master to furnish the guards; he must also adjust them; and the duty of guarding is continuous, so that the guards must be maintained as well as furnished, and kept in condition to perform the service contemplated by the statute."

It only remains to consider the first and second exceptions, which we will briefly do. The first was to permitting a section of the West Virginia Code to be read. That section is as follows: "1. In all manufacturing, mechanical, and other establishments in this State, where the machinery, belting, shafting, gearing, drums and elevators are so arranged and placed as to be dangerous to persons employed therein, while engaged in their ordinary duties, the same shall be safely and securely guarded when possible, and if not possible, the notices of the danger shall be conspicuously posted in such establishments, and no minor or female of any age shall be permitted to clean any of the mill gearing or machinery in such establishments while the same is in motion."

As this plant was in West Virginia, we think it was proper to admit that statute in evidence. It is not contended that the plaintiff could not sue the defendant in this State for these injuries, if service on the defendant could be had, as it was. It might materially affect the usefulness of such a statute, if when suit is brought in a State other than the one where the injury happened the Courts of the former refused to admit it in evidence. It frequently happens that employees live on one side of a State line and work on the other

side, and while they can sue in the State where the accident occurred, they are liable to be required to give security for costs and be subjected to other inconveniences, even if they can furnish the security.   It is now very generally acknowledged that statutes of this character; if they were really and *bona fide* passed for the protection of employees, are not only desirable for them, but are in the end beneficial to employers and the public, and in a country like this, where there are so many different jurisdictions, the Courts of one State should be inclined to aid in the enforcement of such meritorious statutes of another State, at least to the extent of applying their provisions to suits for injuries sustained where the statutes are in force.   Of course we do not mean to say that if a statute of one State be contrary to the policy adopted by the State in which suit is brought or is deemed unreasonable by the Courts of that State, the latter must be governed by it, but where such is not the case it would seem to be only just to apply a statute which presumably was read into the contract of employment, or at least was binding on the parties.   One count of this *narr.* specially relies on the West Virginia statute, and while independent of that there was enough to go to the jury under the other count, we are of the opinion that the West Virginia statute was admissible. Without quoting from authorities we will refer to some where the question is considered.   *Boston & Maine R. R.* v. *Hurd,* 47 C. C. A. 615, 108 Fed. 116, S. C. 56 L. R. A. 193; *Christiansen* v. *William Graver Tank Works,* 223 Ill. 142, S. C. 7 Am. & Eng. An. Cases, 69; 22 *Am. & Eng. Ency. of Law,* 1378; 26 *Cyc.* 1291.

There was no error in the second exception.   Without discussing the question from other standpoints, the conditions stated by the witness, as we understand them, are not shown to be the same as at the time of the accident.   Precisely what the size of the opening was, which the sack covered when Bowers put his foot on the conveyor, is not shown, but there was evidence that the screw forced his leg along in the con-

veyor for some distance, but what the distance was is not known.   There was no evidence that the hole into which Bowers' foot went was larger than the width of the sack, yet the witness in his experiment said; he had "used the width of the bag for an experiment, this width was 26 inches, and placed 2½ inches lime upon it, the hole was longer than the width of the sack."   If his object was to show that the sack sagged under those circumstances, it is very probable that it did when the hole was longer than the width of the sack. There might have been altogether different results if he had experimented with a hole which was known to be of the same size as the one into which plaintiff's foot went.   One of the witnesses said that Bowers' leg had pushed away a part of the covering on top of the conveyor.   One sack might have been stiffer than the other, but even if the sack did sag some before Bowers was hurt, unless he knew or had some reason to suppose there was a sack or something other than the regular cover he would not likely have observed the sagging.   He and the other witnesses who saw it said they did not notice that there was a sack there.   For this and other reasons which might be given, the experiment could not be accepted as satisfactory, but at any rate it is difficult to see how it could have had any material effect, in the face of the positive evidence as to. the actual conditions.   The judgment will be affirmed.

> *Judgment affirmed, the appellant to pay the costs.*