## MOOSE v. GALIGHER MACHINERY CO.

No. 3140.   Decided February 14, 1918.   (171 Pac. 153.)

MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE. A servant, working near an open elevator shaft guarded only by a channel iron 36 inches from the floor, who went on his hands and knees into a cylindrical iron tank to smooth its edges, and in the process rolled it into the shaft, was negligent.[1]

GIDEON, J., dissenting.

---

[1] Roth v. Eccles, 28 Utah, 456, 79 Pac. 918; Fritz v. Electric Light Co., 18 Utah, 493, 56 Pac. 90.

Appeal from District Court of Salt Lake County, Third District; *Hon. George F. Goodwin,* Judge.

Action by J. E. Moose against the Galigher Machinery Company, a corporation.

Judgment for plaintiff.	Defendant appeals.

REVERSED.

*Stephens & Smith,* and *Jas. A. Stump* for appellant.

*Willard Hanson* for respondent.

CORFMAN, J.

Plaintiff brought this action to recover damages for personal injuries alleged to have been sustained by him while in the employ of the defendant. The complaint charges negligence on the part of the defendant. The answer of defendant denies all negligence on its part, and for affirmative defense alleges negligence of the plaintiff, assumption of risk, and carelessness and negligence of plaintiff's fellow servants.

The facts as developed by the testimony given at the trial were, substantially, as follows: On the 22d day of May, 1916, the plaintiff was employed by defendant as a sheet metal worker in its two-story building used for manufacturing purposes in Salt Lake City. This building was equipped with an elevator running from the first to the second floor, and was operated and used by defendant's employees in carrying freight consisting of heavy articles and material from one floor to the other. On the second floor of said building a channel iron was used as a guard rail across the elevator door or opening leading into the elevator shaft. This guard rail when up was held in place by two iron brackets about thirty-five inches from the floor. The space inside the elevator shaft, from guide to guide on which the elevator run, was ten feet four inches. Immediately in front of the elevator shaft on

the second floor and adjoining the same a floor space about 14 feet square was smoothly surfaced with cement or concrete, and it was customary for workmen to there assemble the material used and do their work in the construction of different articles manufactured out of sheet metal. On the said 22d day of May, at about four-thirty o'clock p. m., the plaintiff was engaged in making a galvanized iron cylindrical tank about four feet high and four feet three inches in diameter on the above-mentioned floor space, and after doing a portion of his work he turned the tank over from an upright position to its side, as was customary, and then proceeded to go inside the tank and continue his work. While inside he rolled the tank towards and into the open elevator shaft and, with the tank, fell down to the first floor, thereby sustaining the injuries of which he complains in this action. How the plaintiff performed his work and the conditions and circumstances attending the accident complained of, can be more explicitly stated from the plaintiff's own testimony. We quote from the abstract:

"At the time of my injury I had worked for the company about four years and six months, and all the time in the same class of work. Was paid $4.50 per eight hours. Am acquainted with the Galigher Machinery Company's place of business. It is in the same place as it was when I began working there. The majority of the time I worked on the second floor of the building, probably a day or two or once a month I would have some sheets or something to cut downstairs, but the greater part of the time I worked on the second story of the building. * * * I was working in iron tanks on the day of the injury. * * * The tank I was working in was four feet, three or four inches in diameter, and four feet high. * * * There was more space over on the cement floor. It was clean. I had about fourteen feet square to work in. * * * This cemented place was a good place to do the work. I had been doing this kind of work when anything of the kind was needed all the time I worked there. It was very customary to work on this cement floor, because we had a smooth surface to work on and it was close to the rolls

and to the punch. It was also handy to take the tank down when completed.. You didn't need to roll it the full length of the shop and move three or four tons of stuff to get there. The light was always good there when I had no good light in other places. Others always worked there when they could catch it, when there wasn't some one already there. The one who got there first was the lucky man. I was working immediately in front of the elevator shaft. No one had ever made any objection to my working there. It was necessary, after tipping the tank over, to go inside to do my work. I generally kneel on my knees, spread my legs a little, and roll the tank with my knees either way, to make it conform with where you are pounding on the floor. That is the way I was doing on the day of the accident. A channel iron two by three, I judge, and fifteen or sixteen feet long, is at the elevator shaft to keep the tank from going down. This iron went across the shaft, as shown in Exhibit B. It was a heavy piece, and was held in place by two brackets. The ends projected on each side beyond the brackets three or four feet, I should judge, so it would be necessary to lift the iron to get it out of the brackets. It would require some human force to remove it. Up to the day of the accident this channel iron was kept in place; that is, during the four and a half years I had worked there. I had heard something said about keeping it in place. I heard it from Mr. Davis, our foreman, and from a former foreman, Mr. King, and also heard Mr. Galigher say it. Mr. Davis had been foreman about one year, I think, and the former foreman before him was Sid King. Mr. Galigher is general manager of the company, I believe. I heard Mr. Galigher say that it must be kept up at all times. I heard him give these instructions. I heard Mr. Davis say the same thing to a number of employees. By being kept up, I understood that the channel iron was to be kept in the brackets. During the four and a half years prior to the day of the accident, I judge I had probably seen the iron out once or twice, and during that time I had heard Mr. Davis say that it must be kept up. Ordinarily I saw it kept up. *  *  *  I judge it was a little after four o'clock in the afternoon of the day of the accident that

I put the tank on the cement floor. * * * Up to the time of the accident there were probably three or four others working on that floor. I had a helper whose name was Champion, I think. * * * Mr. Rasmussen, I believe, and his helper were working on that floor that afternoon. During the afternoon I saw some one using the elevator, I believe his name was Larson. Believe he was loading pipe of some kind on the elevator. * * * In using the elevator persons would load it and take it down and unload it and come back and get another load. Goods would be loaded on the elevator and taken down. It is simply an order being filled. I saw Mr. Larson taking pipe of some kind down. As he would carry this he would come right up where I worked. That is the only way he could go to the elevator. He would load the elevator, take it down, and come back as required. I saw him doing that a number of times that afternoon. It was probably four-thirty or four-forty that afternon when the tank was turned down and I went into it. Prior to that the tank had been standing upright. It was probably four-twenty or four twenty-five when I got into the tank while it was standing upright. I wasn't in it very long then, as it didn't take very long to do what I had to do. When I got into the tank standing upright I climbed over the north side of it. I noticed the elevator at the time. I couldn't help but notice it as I was looking right straight to it when I jumped into the tank. The bar was then up in its place. I don't know how the elevator was; I didn't see it, I guess it was clear down on the bottom floor. The elevator had to be below or I could have seen it. The elevator could be about a foot above the floor, but if it had been above at that time I could have seen it. After doing my work in the tank while standing upright, I came out again and saw my helper and sent him for two iron horses to stand the tank on so I could rivet it. He had to go down the stairway for the horses. He left me there and started for the stairway. At about the time I sent my helper for the horses I saw the man loading the elevator. He was going by me towards the elevator. Q. With what? A. I don't know. I don't think he had anything at the time; he might have had

a piece of pipe; I didn't pay much attention. He was the same man who had been using the elevator that afternoon, and he was going toward the elevator right past my tank. I then went in the tank; the tank having been turned over. The open end of the tank was towards the northeast. I went into it and got on my knees and was pounding down the rough edges. As you do that work you have to move the tank to conform with where you are pounding on the floor. The tank rolls with you on the inside. About all you can see is a shadow or anything like that. The only way of seeing out would be through the end. I was facing the bottom of the tank watching my work, and the tank was rolling with me in it. I went into the elevator shaft and the tank struck the top of the cage after it pitched down. The tank struck nothing in going into the shaft, and it didn't go over anything. The tank couldn't go over the bar if one end were down on the cement floor. The tank was not stopped, and there wasn't even a jar in going into the shaft. I was in the bottom of the tank. The tank struck bottom down, I think."

On cross-examination plaintiff testified:

"Q. Then when you got into the tank, when it was down, the bar was up, was it? A. I don't know; I didn't look. Q. You didn't look? A. Not when I went into the can; when it was down I had no occasion to. I didn't notice whether the bar was up or not after I put the tank down. I didn't get out of the tank after I laid it down and before it fell. I worked on my hands and knees, with my face towards the bottom of the tank, so that I was in a stooped position."

It further appears from the testimony that the plaintiff was at the time of the accident forty-six years of age, able bodied, in good health, and earning as a mechanic $4.50 per day. As a result of the accident, he sustained injuries to his arm, head, and spine, and suffered a great deal of pain. Since the accident and up to the time of trial in January, 1917, plaintiff was unable to do any hard manual labor. As to whether his injuries are permanent or only temporary the testimony is not clear.

There was no material conflict in the testimony, except as

to the presence of the employee Larson near the elevator immediately prior to the accident. Mr. Larson testified that he used the elevator at about 1:30 o'clock, that he put up the guard rail when through using the elevator at about 2:00 p. m. and during the remainder of the afternoon was engaged in duties elsewhere, and did not go near the elevator. Other witnesses corroborated Larson's statement.

Trial was to a jury, resulting in a verdict for the plaintiff, and judgment was entered thereon in the sum of $8,500. Defendant appeals.

Errors are assigned in the refusal of the court to grant defendant's motion for a nonsuit at the close of plaintiff's testimony in chief; the court's refusal to give and in the giving of certain instructions, among them the failure to direct the jury to return a verdict for the defendant; the denial of defendant's motion for a new trial on the ground of the insufficiency of the evidence to support the verdict, and that the judgment entered thereon was against law; and that the verdict and the judgment entered thereon was excessive.

To our minds the one controlling question presented by this appeal is whether or not, under the conditions and circumstances attending the accident complained of, plaintiff himself was not guilty of gross carelessness and negligence that was the proximate cause and directly contributed to the injuries he received. It conclusively appears from the record that the elevator was properly constructed and equipped with appliances, and on the day of the accident was in good condition and repair; that it was used exclusively for the purpose of carrying freight from one floor to another in the building where the plaintiff was employed to do his work. It also appears that the plaintiff was thoroughly familiar with its use and the method employed in its operation. That the defendant exercised ordinary care and prudence in furnishing the plaintiff a reasonable safe place in which to perform his work, there can be no doubt, and it is not contended otherwise.

The contention is made, however, by respondent, that the place where the plaintiff was called upon to do his work was not maintained in a safe condition, and was rendered unsafe

by reason of some person, presumably an employee of the defendant, neglecting to put up the guard rail before lowering the elevator, and for this neglect the defendant was chargeable. In support of this contention, plaintiff has cited in his brief the following cases, which he contends are in point, and apply to the case at bar, to wit: *Glennon* v. *Star Co.*, 130 App. Div. 491, 114 N. Y. Supp. 1044; *National Syrup Co.* v. *Carlson*, 155 Ill. 210, 40 N. E. 492; *Johnson* v. *Bruier*, 61 Pa. 58, 100 Am. Dec. 613; *Maguire* v. *Little* (R. I.) 13 Atl. 108; *Barber Asphalt Paving Co.* v. *Austin*, 186 Fed. 443, 108 C. C. A. 365; *Hoffman* v. *Clough*, 124 Pa. 505, 17 Atl. 19; *Security Cement & Lime Co.* v. *Bowers*, 124 Md. 11, 91 Atl. 834; *Raferty* v. *Central Park, etc., R. R. Co.*, 14 Misc. Rep. 560, 35 N. Y. Supp. 1067; *Eastland* v. *Clarke*, 165 N. Y. 420, 59 N. E. 202, 70 L. R. A. 751; *Day* v. *Emery, etc., Co.*, 114 Mo. App. 479, 89 S. W. 903; *Moore* v. *Pac. Coast Steel Co.*, 171 Cal. 489, 153 Pac. 912; *Hennessey* v. *Wabash Mills Co.*, 235 Pa. 31, 83 Atl. 706; *Hillebrand* v. *Standard Biscuit Co.*, 139 Cal. 233, 73 Pac. 163. We have examined the cases cited by counsel, and they announce and adhere to the well-established doctrine that it is not only the duty of the master to provide a reasonably safe place for his servant to perform his work in, but he must use due diligence, and care in keeping the place safe, so that the servant will not be unnecessarily exposed to danger. In the case at bar we think that the conditions and circumstances under which the accident happened and the plaintiff here sustained his injuries are so materially different that the cases cited by plaintiff are not in point and do not apply. The testimony shows that the plaintiff was thoroughly familiar with the building in which he worked, that practically all of his work was performed on the second floor; that he knew the manner in which the elevator was operated and the purposes for which it was being used by the employees of the defendant. During the long period of his employment prior to the accident, he states that he repeatedly heard the foreman and general manager of the plaintiff instruct the employees that the guard rail of the elevator must be kept up at all times, in the brackets which held

it in place; that ordinarily it was kept up, but on one or two occasions he had seen the guard rail out of the brackets. The plaintiff further testified that it was apparent to him that some employee of the defendant was using the elevator immediately before he entered into the tank to finish his work; that he did not take notice whether the bar was up or down when he entered the tank after turning it on its side; that he immediately proceeded to roll the tank, in doing his work, down the open shaft of the elevator, and thus sustained the injuries of which he complains.

We are not prepared to say that, ordinarily, in cases of an accident, the defendant would not be chargeable with the failure of its employee, whose identity is only presumably disclosed, to keep the guard rail of its elevator in place, but we are very firm in our opinion that under all the circumstances and conditions attending plaintiff's accident, he must, as a matter of law, be held guilty of his own gross carelessness, more especially in failing to look and ascertain the condition of the elevator shaft before proceeding in the extremely hazardous, not to say ridiculous, manner in which he did do his work. The plaintiff knew from experience that there was the possibility of some employee, or other person, leaving the guard rail down and the open elevator shaft exposed. He states that he entered the tank without taking any notice of the condition of the elevator shaft, or whether or not the guard rail was in place. He then proceeded to roll the tank with himself in it toward and into the open shaft when he could just as well and conveniently have rolled it in three other directions with perfect safety. *Roth* v. *Eccles*, 28 Utah, 456, 79 Pac. 918; *Fritz* v. *Electric Light Co.*, 18 Utah, 493, 56 Pac. 90; *Reed* v. *Stockmeyer*, 74 Fed. 186-189, 20 C. C. A. 381; *Oleksy* v. *Midland Linseed Co.*, 168 Fed. 896, 94 C. C. A. 308; Labatt, Mast & Serv. (2d Ed.) section 1249.

We do not deem it necessary to discuss nor pass upon in detail all of the questions raised by appellant's brief and argument, for they all go to the question of the right of the plaintiff to recover of the defendant for the injuries plaintiff sustained under the conditions and circumstances attending the accident of which he complains.

We are of the opinion that the trial court erred in refusing, at the conclusion of all the testimony in this case, to direct the jury to return a verdict in defendant's favor as requested.

It is therefore ordered that the judgment of the district court be reversed.   Defendant to recover costs.

FRICK, C. J., and McCARTY and THURMAN, JJ., concur.

GIDEON, J. (dissenting).

In the majority opinion it is conceded that it was the duty of the employer to furnish the plaintiff as a workman with a reasonably safe place in which to work. From the statement of facts it appears that plaintiff, and the other workmen, had been working at the place in question for more than four and a half years in exactly the same kind of work that the plaintiff was then doing. The statement also shows that it was necessary to keep the bar across the opening in the elevator in order to make that particular place a safe place in which to work. That plaintiff did not remove the bar is self-evident. That it was in place when he began to do the work at which he was engaged at the time of the accident is not disputed. The last time he noticed it before he went into the tank the rail was in place. While he was doing the work in the tank some of the other workmen passed up and down with the elevator, and it is reasonable to presume that the other workmen, or some one of them, left the rail down. Now, the ''gross negligence'' mentioned, and which is charged to the plaintiff, is that he did not come out of the tank and examine the opening into the shaft after his fellow workmen had evidently gone down to the floor below. That is, the plaintiff is charged with gross negligence, forsooth, because he did not assume that his fellow workmen would be guilty of negligence by leaving the bar down when descending in the elevator to the floor below. In my judgment the statement of facts does not warrant any such conclusion, but, on the contrary, shows conclusively, as the jury must have found, that some one of the

other workmen besides the plaintiff, without the plaintiff's knowledge and after he had entered the tank for the purpose of doing the work in question, negligently removed the bar and left it down. No claim is made that the workman using the elevator was a fellow servant of the plaintiff. Plaintiff did not, therefore, assume the risk due to the negligence of such fellow workman, and cannot be held responsible for any injury resulting from such negligence. The employer should be held to answer for such negligence.

The judgment of the district court, in my opinion, should be affirmed. I therefore dissent.